**D.H., a minor by his mother Angela DAWSON, Plaintiff,**

v.

**CLAYTON COUNTY SCHOOL DISTRICT, Former Eddie White Academy Assistant Principal Tyrus McDowell, individually, Defendants.**

**Civil Action No. 1:12–CV–00478–AT.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Signed Sept. 30, 2014.

Adam B. Wolf, Tracey B. Cowan, Wolf Legal, P.C., San Francisco, CA, Craig Lewis Goodmark, Goodmark Law Firm, LLC, Decatur, GA, Gerald R. Weber, Law Offices of Gerry Weber, LLC, Atlanta, GA, for Plaintiff.

John C. Jones, Law Offices of John C. Jones, Marietta, GA, William F. Amideo, Law Office of William F. Amideo, Alpharetta, GA, for Defendants.

## ORDER

AMY TOTENBERG, District Judge.

This case involves the constitutionality of a strip search conducted by a school official on a seventh grade boy in the presence of other students. It is before the Court on the parties' Cross Motions for Summary Judgment [Docs. 112, 114, 116, 117] and Plaintiffs Motion to Strike Declaration of Latasha Lowe [Doc. 137]. The Court's rulings are set forth below.

## I. BACKGROUND [1]

D.H. was a twelve-year old seventh grader at Eddie White Academy on February 8, 2011 when he was required to strip down to his underwear by an assistant principal searching for marijuana.[2] (*See* D.H. Dep. at 7, 14, 59.) Eddie White Academy ("EWA") is a public school in the Clayton County School District consisting of grades kindergarten through eighth grade. (Ratcliff Dep. at 80; McDowell Dep. at 152.) Although this case involves only the claims of D.H., he was the fourth student to be searched for suspected possession of marijuana at the school. Therefore it is helpful to first discuss the events leading up to the search of D.H. to put the search in context.

On February 8, 2011, EWA Assistant Principal Sheneaise Williams Ratcliff ("Ratcliff") was informed by the School Resource Officers[3] ("SRO"), Ricky Redding ("Deputy Redding"), that a student had reported that "[D.V.] had drugs in the school and was passing them around the classroom."[4] (Ratcliff Dep. Ex. 1; Ratcliff Dep. at 10; Redding Dep. at 51, 86–87.) According to Ratcliff, "there had been prior situations with D.V. and speculation of drugs," and that he had been searched on several other occasions for suspicion of bringing weapons and drugs to school. (Ratcliff Dep. at 32–33, 40.)

### A. Searches of D.V., T.D., and R.C.

At that time, the seventh grade students were in their first period classes. (Ratcliff

---

1. The factual statement here does not constitute actual findings of fact. The Court derives the facts below from the evidence in the record and views these facts in the light most favorable to the non-movant.

2. All of the students searched on February 8, 2011 were seventh graders.

3. School Resource Officers are law enforcement officers employed by the Clayton County Sheriff's Office who are assigned to work in the Clayton County School District's schools to provide a school security program operated by the Sheriff's Office pursuant to an agreement with the School District. (*See* Doc. 117–3.)

4. Ms. Ratcliff's deposition contains either an errant misstatement or a typographical error with regard to her initial identification of the first student reported to possess drugs on school grounds. On page 36 of Ratcliff's deposition, the transcript reads "Deputy Redding came to me and he told me that it was reported a student came to him about [D.H.] having drugs and was passing them around,

the drugs, to other students." (Ratcliff Dep. at 36.) However, on page 38, the transcript reflects that it was D.V. whom Deputy Redding had informed Ratcliff as the student suspected of having marijuana at the school. (*Id.*) The testimony on page 38 is consistent with the written statement given by Ratcliff on February 9, 2011, and with the remainder of her testimony that D.V. was the first student pulled out of class to be searched for possession of marijuana. (*See* Ratcliff Dep. at 38–44; Ratcliff Dep. Ex. 1.) Redding's deposition confirms that D.V. was the first student called to be searched for suspicion of drug possession. (Redding Dep. at 86.) According to Redding another student, A.D., informed him and Ratcliff that D.V. had drugs on him at school. (*Id.* at 87.) McDowell's Responses to Plaintiffs Interrogatories indicates that "the search of D.H. that was conducted occurred because marijuana was found on three students and one of those students (D.V.) identified D.H. as a fourth student having marijuana on his person. (Doc. 138–8 at 3.)

Dep. at 39–40.) Ratcliff pulled D.V.'s schedule of classes, and went to retrieve him out of his first period art class. (*Id.* at 39.) Ratcliff asked D.V. to bring his book bag with him to her office. (Id.) Once in her office, Ratcliff asked D.V. to open his book bag and empty its contents. (*Id.* at 39–41; Ratcliff Dep. Ex. 1.) D.V. complied, emptied all of the contents of his book bag on a table, and Ratcliff looked inside the bag's zipper compartment. (Ratcliff Dep. at 40–41.) It appeared nothing was in the book bag. (*Id.*) Although she does not remember asking D.V. to pull his pockets inside out, Ratcliff testified that she "might have because that was typical." (Ratcliff Dep. at 41.) Eventually during the search, D.V. stated "I know what you all are looking for," and identified another seventh grade student, R.C., as someone he had seen with marijuana. (Ratcliff Dep. at 42–43; Redding Dep. at 87–88.) Although Ratcliff testified that D.V. did not mention where R.C. had hidden the marijuana, according to her February 9, 2011 written statement, D.V. indicated that the marijuana was in R.C.'s book bag. (Ratcliff Dep. at 43; Ratcliff Dep. Ex. 1.)

Ratcliff then escorted D.V. to the front office to wait while she went to retrieve R.C. from his class. (Ratcliff Dep. at 43–44; Ratcliff Dep. Ex. 1.) Ratcliff brought R.C. to Deputy Redding's office and asked him whether he had drugs on him. (Ratcliff Dep. at 44–46; Ratcliff Dep. Ex. 1.) According to Ratcliff, after R.C. denied having drugs, she asked him to open and empty his book bag[5] and she performed a search of the book bag and found nothing.[6] (Ratcliff Dep. at 46–48; *see also* Redding Dep. at 89.) During the search, Ratcliff perceived R.C. to be visibly nervous and thought he was being untruthful about having drugs. (Ratcliff Dep. at 49.) Ratcliff also testified that she believes she would have asked R.C. to turn his pockets inside out. (Ratcliff Dep. at 50.) R.C. then informed Ratcliff that T.D., also a student in the seventh grade, was in possession of marijuana at school.[7] (Ratcliff Dep. at 49–50; Ratcliff Dep. Ex. 1; Redding Dep. at 90.)

By this time, the seventh grade students were in their second period classes. (Ratcliff Dep. at 51.) Ratcliff left Deputy Redding's office to go find T.D. in his second period class. (Ratcliff Dep. at 50–51.) While Ratcliff was gone to find T.D., Deputy Redding waited in the office with R.C. According to Deputy Redding, R.C. was fidgeting. Redding asked R.C. to remove his shoes and socks. (Redding Dep. at 91, 98.) R.C. removed his shoes and socks and a bag of marijuana and two rolled blunts fell out onto the floor. (Redding Dep. at 91–92.) Deputy Redding asked R.C. to pick the marijuana up and put it on the desk beside him. (Redding Dep. at 92.) Deputy Redding informed Ratcliff upon her return that marijuana had been found on R.C., who indicated he had gotten the marijuana from D.V. (Redding Dep. at 92.) R.C. told Ratcliff that D.V. had marijuana in his book bag. (Redding Dep. at 99.)

5. R.C. testified that he did not have a book bag with him that day, but carried a zip-up binder/notebook and that Deputy Redding searched his notebook but did not find any marijuana. (R.C. Dep. at 48, 51.) Deputy Redding testified, consistent with Ratcliff, that Ratcliff searched R.C.'s book bag. (Redding Dep. at 89.)

6. Deputy Redding testified that Ratcliff found a rolling paper on R.C. (Redding Dep. at 90.) Ratcliff did not mention finding a rolling paper on R.C. in either her February 9, 2011 written statement or her deposition.

7. R.C. does not remember whether he told Ratcliff that T.D. was also in possession of marijuana at school that day. (R.C. Dep. at 53–54.)

When Ratcliff returned to Deputy Redding's office with T.D., Deputy Redding said to him "you know what we're looking for so ... give it to us." (Ratcliff Dep. at 52; Ratcliff Dep. Ex. 1; Redding Dep. at 92–93.) In response, T.D. "turned away from [Ratcliff,] unbuttoned his pants and reached in what appeared to be his underwear and pulled out" marijuana wrapped in plastic. (Ratcliff Dep. Ex. 1; Ratcliff Dep. at 52–55; Redding Dep. at 93 (stating that T.D. "turned away from Ms. Ratcliff, and he reached down in his pants and pulled out a bag of marijuana and gave it to Ms. Ratcliff").) According to Ratcliff, she saw T.D. reach in his pants and believed he was reaching into his underwear "[b]ecause he reached kind of deep and it was in the front. It wasn't a side pocket. It was directly in the front" and he did not appear to be pulling it out "from between his belt and the outside of his pants." (Ratcliff Dep. at 54–56.) T.D. turned around, with his pants slightly undone, and put the marijuana he took out from inside his pants onto Deputy Redding's desk. (Ratcliff Dep. at 55, 86.) The "bag" of marijuana found on T.D. was about the size of the exhibit sticker used for the deposition exhibits in the case. (McDowell Dep. 104–105.)

In her deposition, Ratcliff states that T.D. told her that he got the drugs from D.H. (Ratcliff Dep. at 57.) However, her February 9, 2011 written statement does not indicate that D.H. was identified by T.D. as having drugs. After counsel referred Ratcliff to her written statement, Ratcliff stated that she was not in the room when she believes T.D. implicated D.H. but "just assumed it was the next child," apparently because D.H. was the next student that Deputy Redding asked to see. (Ratcliff Dep. at 61–64.) Ratcliff's written statement indicates that she left the room after T.D. produced the marijuana from his underwear in order to get fellow Assistant Principal Tyrus McDowell ("McDowell") to take over the investigation. (Ratcliff Dep. Ex. 1; Ratcliff Dep. at 57, 60; McDowell Dep. 88.) Her written statement further indicates that when she returned to Deputy Redding's office to meet Mr. McDowell she observed more drugs on his desk and asked Deputy Redding where the drugs had come from. (Ratcliff Dep. Ex. 1.) Redding informed her that the drugs had been found in R.C.'s sock. (Id.) Mr. McDowell then arrived to continue the searches.[8] (Id.) "Deputy Redding later called for [Ratcliff] to bring [D.V.'s] book bag to his office. Upon bringing the book bag he asked to see D.H." (Id.) Ratcliff's written statement is consistent with: (1) Deputy Redding's testimony that T.D. said that the marijuana came from R.C., (Redding Dep. at 97), (2) Mr. McDowell's testimony that he asked Ratcliff to get D.H. after searching D.V. and that it was D.V. who had identified D.H., (McDowell Dep. at 111, 158), and (3) T.D.'s testimony that he never stated to anyone that D.H. had marijuana at school, (T.D. Dep. at 52).

Ratcliff decided to turn the situation over to McDowell because T.D. seemed embarrassed and uncomfortable after reaching into his underwear in front of her during the search for the marijuana. (Ratcliff Dep. at 57, 87–88.) She left the room and went to call Mr. McDowell to let him know what had transpired with the search of T.D. (Ratcliff Dep. at 89.) Ratcliff testified that she informed McDowell that the student had "pulled drugs out

---

**8.** Ratcliff testified that she left upon McDowell's arrival at Deputy Redding's office. (Ratcliff Dep. at 61.)

from what appeared to be his underwear." (Ratcliff Dep. at 57–58.)

According to McDowell, Ratcliff called and asked him whether he had ever been aware of an incident where a student would hide marijuana in his or her underwear, to which McDowell responded he had not. (McDowell Dep. at 88–89.) McDowell testified that Ratcliff advised him that one or more students had hidden marijuana in their underwear, while her testimony indicates she only identified one student. (McDowell Dep. at 89; Ratcliff Dep. at 57–58.) Although at the time of his deposition, McDowell could not recall specifically whether Ratcliff said the marijuana was found in the student's underwear, his waistband, or his pants, in his Responses to Plaintiff's Interrogatories, McDowell indicated that it was his "understanding that marijuana had already been found in the waistband of the underwear of one or both students who had already been searched." (McDowell Dep. at 98; Doc. 138–8 at 3.) McDowell was not aware at the time that only one student had been found with marijuana in his underwear and believed that it may have been two students. (*Id.*)

When McDowell arrived at Deputy Redding's office, he observed T.D. and R.C. in handcuffs. (McDowell Dep. at 90.) McDowell proceeded down the hall to the front office to locate Ratcliff. (*Id.* at 90–91.) McDowell found Ratcliff and D.V. in the front office, McDowell and Ratcliff spoke, and Ratcliff informed McDowell that D.V. was possibly connected to the marijuana found on the other students. (McDowell Dep. at 91–94.) McDowell believed that Ratcliff had already searched D.V.'s book bag and found nothing, but that she had not yet "searched him." (*Id.* at 94.) McDowell then took D.V. down to Deputy Redding's office so that he could perform a search of D.V. with Deputy Redding as a witness. (*Id.* at 94–95.) McDowell did not know who had reported D.V. as having drugs or the details of what had been reported to Ratcliff regarding his connection to the drugs previously found on the students he observed handcuffed in Redding's office (T.D. and R.C).[9] (*Id.* at 97–98.) At that time, McDowell was not aware of any other students alleged to be in possession of drugs at the school that day. (McDowell Dep. at 99.)

McDowell and Deputy Redding both asked D.V. whether he had any drugs on him, to which he responded "no." (McDowell Dep. at 99.) At this time, McDowell observed that both T.D. and R.C. were crying. (*Id.*) McDowell then proceeded to search D.V., asking him to remove his shoes, socks, and top shirt, and to turn his pant pockets inside out. (McDowell Dep. at 106.) As McDowell observed that D.V. was wearing elastic basketball shorts underneath his pants, he asked D.V. to pull his pants down and turn the pockets of his shorts inside out. (*Id.* at 106–107.) McDowell then asked D.V. to pull his basketball shorts down to determine whether he was hiding drugs in the elastic waistband of the shorts. (*Id.* at 107.) At this point, D.V. was standing in his underwear which were "boxer briefs," which McDowell explained unlike "boxers" have elastic at the waist, leg, and the bottom. (*Id.* at 107, 109.) McDowell asked D.V. to "pull those away from his actual physical person, away and down, just to make sure that there was ... nothing hidden in the elastic part of those." (*Id.* at 107.) When D.V. complied by pulling his underwear down, McDowell could see D.V.'s genitals from where he was standing. (*Id.*) Once McDowell saw that D.V. did not have any drugs hidden in his underwear, he told

---

9. McDowell was not present for the searches of T.D. or R.C.

D.V. to pull his pants back up and put his shirt back on. (*Id.*) Having found no drugs on D.V.'s person, McDowell called Ratcliff to bring D.V.'s book bag from the office. (Ratcliff Dep. at 59; Ratcliff Dep. Ex. 1.) McDowell searched D.V.'s book bag and found a small compartment with an Altoid tin containing marijuana. (McDowell Dep. at 110.)

According to McDowell, D.V. then identified D.H. as another student possibly having marijuana in his possession.[10] (McDowell Dep. at 111.) Without questioning D.V. further about the specific facts concerning D.H.'s alleged possession of marijuana, McDowell then called Ratcliff over the radio to ask her to bring D.H. to Deputy Redding's office. (*Id.*) R.C. and T.D. both testified that R.C. told McDowell and Deputy Redding that D.H. did not have any drugs on him before they pulled D.H. out of class. (R.C. Dep. at 91; T.D. Dep. at 52–53.)

### B. Search of D.H.

D.H. was in his Language Arts class when Ratcliff came to the classroom and told him to bring his book bag and come with her. (D.H. Dep. at 81, 84; *see* Ratcliff Dep. at 65–66.) Ratcliff escorted D.H. to Deputy Redding's office. (D.H. Dep. at 85.) Ratcliff did not tell D.H. why he had been called out of class. (*Id.* at 86; Ratcliff Dep. at 66.) Ratcliff had never had any issues with D.H. prior to the events of February 8, 2011 nor had he ever been reported as having brought illegal drugs to school. (Ratcliff Dep. at 66.) Ratcliff testified that while one could make the assumption that because some students had marijuana in their underwear that some others might also, she personally did not anticipate that D.H. might also have marijuana in his underwear even after observing T.D. apparently pulling marijuana from his underwear. (Ratcliff Dep. at 89–90.) There is no evidence that McDowell endeavored to talk with Ratcliff about her perceptions of D.H. prior to proceeding with his search of D.H. Defendants have not pointed to any evidence that McDowell took any action to determine whether D.H. was known to associate with D.V. or any of the other students who had been found with marijuana, or whether D.H. had been suspected previously of drug involvement. Nor did McDowell talk with Ratcliff or any other administrator about D.H.'s prior disciplinary record or lack of one.

Deputy Redding, McDowell, D.V., T.D., and R.C. were present in Deputy Redding's office when D.H. arrived with Ratcliff. (D.H. Dep. at 88–89.) Deputy Redding informed D.H. that drugs had been found at the school and he and McDowell wanted to know whether he had any drugs on him. (D.H. Dep. at 90.) D.H. denied having any drugs on him. (*Id.*) Redding asked him "are you sure because you are going to get searched," and D.H. responded that "yes," he was sure that he was not in possession of any drugs. (*Id.*)

According to McDowell, when D.H. entered Deputy Redding's office, McDowell

---

**10.** According to R.C., both D.V. and T.D. identified D.H. as having drugs that day as well. (R.C. Dep. at 91.) At first, R.C. testified that T.D. and D.V. told Deputy Redding that "[D.H.] had something to do with it." (*Id.*) Subsequently, when asked whether T.D. and D.V. told Deputy Redding and Mr. McDowell that D.H. had drugs on him, R.C. responded "Yes, sir." (*Id.*) R.C. further testified that before D.H. was pulled out of class, R.C.

told Redding and McDowell that D.H. "did not have drugs on him at all." (*Id.*) T.D. denies having identified D.H. as having marijuana at school that day. (T.D. Dep. at 52.) According to T.D., D.V. was the only student who accused D.H. of having drugs and testified that he agreed out loud with R.C. when R.C. told Redding D.H. did not have any drugs. (T.D. Dep. at 51–53.)

explained to him that he had been identified or accused as being in possession of marijuana on the school campus. (McDowell Dep. at 114.) McDowell informed D.H. that "because of the severity of the situation" he was going to have to search him "just to make sure" he did not have any drugs on him. (*Id.* at 114–115, 119.) McDowell then told D.H. to empty his book bag. (D.H. Dep. at 91.) McDowell looked through the pencil boxes, zippers, and pouches of D.H.'s book bag. (*Id.* at 92.)

McDowell then proceeded to search D.H.'s person. (D.H. Dep. at 92.) McDowell first told D.H. to take off his shoes. (*Id.* at 93; *see also* McDowell Dep. at 119 (stating that he asked D.H. to remove his shoes and socks).) Then he asked D.H. to empty his pockets. (D.H. Dep. at 94; *see also* McDowell Dep. at 119.) After D.H. emptied out his pockets, McDowell told him to take off his pants. (D.H. Dep. at 94; *see also* McDowell Dep. at 119 (stating that he asked D.H. to pull his pants down).) D.H. dropped his pants to the floor, stepped his legs out of them, and pushed them aside with his foot. (*Id.* at 95.) Underneath his pants, D.H. was wearing red and navy blue Tommy Hilfiger boxers—the kind with an elastic waist but that are loose around the thigh. (*Id.* at 94–95, 113.)

According to D.H. at this point in time, R.C. said aloud that D.H. did not have any drugs. (D.H. Dep. at 96.) D.H. testified that Deputy Redding responded by saying "why didn't you say that before we brought him in here," to which R.C. stated that he had told McDowell. (D.H. Dep. at 97.) Deputy Redding testified that R.C. told McDowell that D.H. did not have

drugs on him and that D.V. was lying. (Redding Dep. at 127.) According to Deputy Redding, R.C. made this statement after McDowell had searched D.H. (Redding Dep. at 127–128.)

At some point, McDowell asked D.H. to remove his uniform polo-style shirt, which according to D.H. was the only shirt he was wearing that day. (D.H. Dep. at 99.) D.H. testified that he was not wearing an undershirt.[11] (*Id.*) McDowell next told D.H. to flip his socks at the top to see if he was hiding anything under the band of the sock. (D.H. Dep. at 100.) McDowell then told D.H. to take off his socks. (D.H. Dep. at 100–101.) Finally, McDowell pointed at D.H.'s boxers and said "take those off." (D.H. Dep. at 102; *see also* McDowell Dep. at 120 (stating that he asked D.H. to "pull his underwear away from his body and in a down motion just in case if [sic] he had anything in his—on his person, it would fall to—fall to the ground").) D.H. asked McDowell "do I have to do this here," to which McDowell responded yes. (D.H. Dep. at 102.) D.H. complied by turning to the left (with his back to his classmates) and pulling his underwear down to his ankles. (D.H. Dep. at 103, 105, 107.) McDowell paused, bent over and observed D.H.'s genitalia. (D.H. Dep. at 108; McDowell Dep. at 120–121.) After finding nothing hidden in D.H.'s underwear, McDowell asked him to put his clothes back on. (D.H. Dep. at 108; McDowell Dep. 120.) No marijuana or other illegal contraband was found on D.H. or in his belongings. (McDowell Dep. 124; Def.'s Resp. to PSMF ¶ 10.) Prior to requiring D.H. to strip down to his underwear to search him for marijuana, McDowell did not conduct a search of his locker, gym

---

11. McDowell testified that if he remembered correctly D.H. was wearing a t-shirt, that he did not recall asking him to remove his t-shirt, and that it is possible that he was wearing a t-shirt during the search. (McDowell Dep. at 123–124.)

locker, desk, wastebasket, or classroom.[12] (McDowell Dep. at 126–129.)

According to McDowell, D.H. asked whether they could go to the restroom to do the search. (McDowell Dep. at 120.) McDowell denied D.H.'s request because as he explained he needed Deputy Redding to be a witness to the search. (*Id.* at 125.) McDowell admitted that he could have called Ratcliff in to observe the other students in Deputy Redding's office while he and Deputy Redding went to the bathroom to conduct the search of D.H., but he did not think of that as an option at the time. (*Id.*)

After searching D.H., McDowell escorted D.H. to the counselor's office to call his mother to advise her of the search and then sent D.H. back to class. (D.H. Dep. at 109–110.) D.H.'s stepfather immediately came to pick him up from school and D.H. never returned to EWA. (*Id.* at 110–112, 14.) D.H. was immediately withdrawn from EWA as a result of the search and began attending a different school. (*Id.* at 14.)

D.H. suffered deep embarrassment as a result of being subjected to the strip search by McDowell. (*Id.* at 69, 122.) D.H. never again wore that pair of underwear and threw them away. (*Id.* at 114.) D.H. was teased by a classmate who heard about the search and called him "Spiderman," a reference, he believed, made regarding his underwear. (*Id.* at 118.) D.H. testified that since the search, he has had difficulty trusting adults in positions of authority such as teachers, principals, and officers. (*Id.* at 122.) The embarrassment of the search also changed his behavior. Prior to the search, D.H. would change clothes in the presence of his teammates before and after a sports practice. As a result of the search, he became uncomfort-

able undressing in front others and no longer changes for football and basketball in front of his teammates, but instead chooses to change in a bathroom stall. (*Id.* at 50–59, 122.) Some of his teammates have asked him why he changes in the bathroom stall and thought it was a joke when he told them he felt weird changing in front of them. (*Id.* at 57.) D.H. testified that he now feels like "somebody could be watching" him. (*Id.* at 56.)

Assistant Principals Ratcliff and McDowell considered the presence of marijuana at school a serious problem and thus believed that administrators could search students and their belongings to find marijuana. (*See* Ratcliff Dep. at 94 (testifying that "marijuana and guns in schools" is "a very serious problem" and that if marijuana is found at school the administrators need to find it); McDowell Dep. at 114, 119 (testifying that the students searched were searched for marijuana because of the severity of the situation).) McDowell considered the presence of drugs at the school to be particularly problematic because of the unique situation at EWA which includes kindergarten through eighth grade. (McDowell Dep. at 152.) Although the school was architecturally broken out into separate wings with "K through 5" on one side and "6 through 8" on the other, students at EWA share the common areas, including the cafeteria, library, courtyards, and front office, and sixth through eighth grade girls had some courses on the elementary wing. (McDowell Dep. at 153.)

In her positions as counselor and assistant principal, Ratcliff had received training as to the different places students will hide drugs, including hiding it in their pants. (Ratcliff Dep. at 67–68.) The February 8, 2011 search of T.D. was the first instance during which Ratcliff had experi-

---

**12.** Nor was such a search conducted by any other school official.

enced a student hiding drugs inside or beneath his pants (other than in pockets). (Ratcliff Dep. at 67–68.) The three students, R.C., T.D., and D.V. were found with less than 1 ounce of marijuana each. (Redding Dep. 91, 93.)

## C. CCSD Search Policies

According to Plaintiff, the official CCSD search policy at issue in February 2011, as set forth in the administrative regulation JD–R(1) provides:

INTERROGATIONS AND SEARCHES

The principal or designee of each school in the District is authorized to conduct reasonable interviews of students in order to properly investigate and address student misconduct. Students who are suspected of misconduct or of violating the Student Code of Conduct may be questioned about misconduct by school staff. Students who may have been witnesses to misconduct on the part of other students, faculty, and/or staff may be asked to provide oral or written statements regarding what they know about the event being investigated. Principals or designees may interview students without prior notice or permission of parents/guardians.

As permitted by applicable authority, the principal or designee of each school in the District may conduct reasonable inspection of students' school lockers, articles carried upon their persons, and vehicles in order to properly investigate and address student misconduct.

Searches based on reasonable suspicion may proceed without hindrance or delay, and they should be conducted as directed by school administration. Searches will be based on a reasonable suspicion of the presence of harmful or prohibited items.

Lockers, desks and school/classroom storage areas are the property of the District. Students shall not consider these areas to be private.

(Hendrix Dep. Ex. 10; Hendrix Dep. at 77 (testifying that this was the search policy that was in place at the time the Plaintiff's search was conducted in February 2011).) [13]

According to CCSD there are two search policies at issue in this case: (1) the official administrative regulation set forth in JD–R(1) (quoted above), and (2) a statement regarding "Search and Seizure" in an undated version of a CCSD Student Handbook. (*See* CCSD SMF ¶ 6, 7; CCSD Resp. to PSMF ¶ 13.) The undated version of the Student Handbook [14] provides:

Search and Seizure

Clayton County Public Schools may use metal detectors, sniffing dogs or other detection devices, such as wands, etc., to ensure school safety. Routine unannounced searches of cars on school property, school buses, lockers, school computers, and student desks will be conducted by school officials. Students and parents are hereby notified that a student has no expectation of privacy in these locations, including in student vehicles if the student chooses to exercise the privilege of parking on campus.

---

**13.** Plaintiff also relies on identical language contained in a Student Handbook dated for the 2012–2013 school year that Hendrix testified was the handbook statement regarding searches at the time the Plaintiff's search was conducted in 2011. (*See* Hendrix Dep. Ex. 9; Hendrix Dep. at 76.) This 2012–2013 version was the handbook produced by CCSD during discovery and relied on by CCSD in support of its motion to dismiss.

**14.** CCSD produced this version of the search policy for the first time in connection with its summary judgment motion.

Unauthorized items and items that threaten the safety of self and others will be seized and the appropriate disciplinary action will be taken. (CCSD SMF ¶ 7; Lowe Decl. Ex. 2.)[15]

### D. Evidence of Administrator Training and Other Searches

At the time of the February 8, 2011 search, CCSD employees, including McDowell had not received any training on how or when to conduct a strip search, including that:

(a) individual suspicion was required to conduct a strip search of a student, (CCSD Resp. to PSMF ¶ 1);

(b) a strip search could be conducted only in situations where there was a belief that a student possessed contraband that could pose a danger if not found, (CCSD Resp. to PSMF ¶ 2);

(c) the age of the student must be taken into account when deciding whether to conduct a strip search or how extensive a search should be, (CCSD Resp. to PSMF ¶ 3);

(d) the presence of others/witnesses should be taken into account before conducting a strip search of a student, (CCSD Resp. to PSMF ¶ 4); and

(e) a search underneath the clothing of a student could be conducted only if officials believed there was contraband underneath the clothing, (CCSD Resp. to PSMF ¶ 5).

CCSD had no written training materials from 2000 to 2011 addressing when or how to conduct strip searches. (CCSD Resp. to PSMF ¶ 6.) CCSD's only written training document that discusses student strip searches is dated July 2012, after the search of D.H. on February 8, 2011. (CCSD Resp. to PSMF ¶ 7.)

CCSD's Rule 30(b)(6) witness, Douglas Hendrix, Chief of Human Resources and Public Information Officer for Clayton County Public School District, testified, based on his personal experience that CCSD held annual training from 2004 to 2007 for principal and assistant principals where it "was always mentioned" that no strip searches of students were permitted. (Hendrix Dep. at 26, 59–60; *see also* CCSD SMF ¶ 11 (stating "[f]rom at least 2000 to 2007, CCSD has provided training on searches and other topics through its student services division").) CCSD kept no records regarding its employees' attendance at trainings. (CCSD Resp. to PSMF ¶ 8.) Hendrix testified that he thinks the training has not changed, but acknowledged that he had no information or knowledge of the training as Defendant's 30(b)(6) designee for the period after 2007. (*Id.*) In his official capacity as CCSD representative, Hendrix testified that the only specific knowledge he had that each of the school district's principals and assistant principals received training about strip searches would be from the written training documents created by the school district's counsel. (Hendrix Dep. at 60–62.) CCSD's written training materials from 2010 do not include any references to strip searches.[16] (Hendrix Dep. at 63–64.)

---

**15.** According to the Declaration of Latasha Lowe, the Legal Compliance Officer for CCSD since 2011, this undated Student Handbook was the version in effect for the 2010–2011 school year. Plaintiff has moved to strike Lowe's Declaration. For the reasons set forth below, the Court will not consider Ms. Lowe's testimony.

**16.** CCSD does not possess nor did it produce any training documents referencing either the Eleventh Circuit's decision in *Thomas ex rel. v. Roberts,* 261 F.3d 1160 (11th Cir.2001), *cert. granted, judgment vacated sub nom. Thomas v. Roberts,* 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 829 (2002) and *opinion reinstated,* 323 F.3d 950 (11th Cir.2003), which held that CCSD's strip searches of mul-

McDowell testified that he did not receive any training from CCSD regarding his authority to search students or the limits on conducting strip searches. (McDowell Dep. at 41, 48.) McDowell was never trained or informed by anyone at CCSD as to what "applicable authority" governed the scope of the school district's search policy and had no information upon which to assess what was meant by the policy's reference to "applicable authority." (McDowell Dep. at 62.) McDowell understood "however . . . that the school administrators had the authority to search the person of a student." (*Id.* at 48.) McDowell testified that "the person of a student" to him meant their clothing, pockets, book bags, and "anything that's on the physical person of the student," including their underwear or socks. (McDowell Dep. at 49–50.) Although McDowell was aware of the policy in the student handbook, he had not been told by anyone at CCSD to review the policy, and he had not reviewed it "for the specificity of it" until after he had conducted the February 8, 2011 searches. (McDowell Dep. at 57–58.) McDowell testified that he had no understanding of Clayton County policy with regard to the ability of administrators to search students at the time he worked there. (McDowell Dep. at 42.) He testified that his basis for believing that he had the authority to search students came from his interaction and prior work with principals at other schools that "administrators could initiate [a] search of a student if there is a reason to believe that the student needed to be searched. And Clayton County policy was not very specific on that." [17] (McDowell Dep. at 42.) Specifi-

cally, McDowell testified that he learned from his former principal at another Clayton County school that if an administrator had reason to believe that a student had drugs or a weapon, that the student could be searched by the administration. (*Id.* at 43–47.) During the February 8, 2011 searches, McDowell relied on Deputy Redding's position as the SRO to know the parameters of a lawful search better than his own knowledge. (McDowell Dep. at 132–133.) According to McDowell, Deputy Redding's advice influenced McDowell's decision to require D.V. and D.H. to remove their pants during the search for marijuana. (McDowell Dep. at 132–133.) Deputy Redding, however, denies giving McDowell any directions or participating directly during the searches. (Redding Dep. at 108, 135, 137, 139–140.)

McDowell was present during numerous searches of students suspected of possessing drugs conducted by the principals at Lovejoy High School, another CCSD school at which McDowell was previously employed as an assistant principal. (McDowell Dep. at 44–45.) These incidents involved book bag searches, students being asked to turn their pants pockets inside out, and searches of shorts worn under the students' pants. (McDowell Dep. at 71–76.) McDowell testified that he participated in and observed searches where students were asked to pull out the pockets of shorts worn under their pants. (McDowell Dep. at 72–74.) McDowell further testified that it was possible that he asked students to pull down their pants in order to search the pockets of shorts worn under their pants, and that to ensure that nothing was hidden in those pockets it

tiple students violated the Constitution, or the Supreme Court's decision in *Safford Unified School Dist. No. 1 v. Redding,* 557 U.S. 364, 129 S.Ct. 2633, 174 L.Ed.2d 354 (2009), concerning student strip searches. (CCSD Resp. PSMF ¶ 24.)

17. McDowell also testified that his understanding was based on his previous readings in a college course dealing with student searches. (McDowell Dep. at 51–52.)

would be necessary to have the students take their pants down to access the pockets of their shorts. (McDowell Dep. at 75.)

Ratcliff testified that administrators at EWA conducted several searches of students and their belongings for suspicion of drugs. (Ratcliff Dep. at 23–36.) Ratcliff testified that during student searches, she has asked students to turn their pockets inside out, and searched book bags and desks. (*Id.* at 21, 27, 35.) However, the February 8, 2011 search of T.D. was the first instance during which Ratcliff had experienced a student hiding drugs underneath his clothing. (*Id.* at 67–68.)

CCSD does not know the total number of student searches conducted by its teachers or administrators. (Hendrix Dep. at 89–91.) CCSD admits that it has no mechanism in place to determine how many searches, searches of clothing, or strip searches its employees conduct. (CCSD Resp. PSMF ¶ 15.) CCSD does not maintain any standardized documentation system with the purpose of memorializing the date, time, location, and factual basis for the execution of student searches. (CCSD Resp. PSMF ¶ 15; Hendrix Dep. at 34–37.) CCSD does not maintain any centralized data collection device to record or analyze data regarding student searches. (CCSD Resp. PSMF ¶ 15.) CCSD is without any information about the total number of strip searches that have been conducted on its students from 1996 to the present. (CCSD Resp. PSMF ¶ 15.) CCSD has received a few other complaints of improper strip searches of students but disputes the validity of these complaints. (CCSD Resp. PSMF ¶ 20.)

## II. ANALYSIS

### A. Plaintiffs Motion to Strike Declaration of Latasha Lowe

■ In a classic bait and switch maneuver, Defendant CCSD offers a new theory of its defense to Plaintiff's failure to train claim, supported by evidence of an entirely different search policy, for the first time in this litigation at the summary judgment stage. Abandoning its reliance on the Clayton County Policy JD–R(1) regarding student searches that was the subject of the parties' motion to dismiss and extensive discovery, CCSD argued on summary judgment that a different policy found in an undated Student Handbook was the applicable official policy and prohibited searches of students. (*See* Mot. to Dismiss at 14 (citing Clayton County Policy JD–R(1) as "clearly demonstrat[ing] that the District maintains a policy whereby student searches, including searches for "articles carried upon their person," must be conducted in accordance with law (i.e., "As permitted by applicable authority") and on the basis of "reasonable suspicion."). CCSD offered this new "policy" through the Declaration of Latasha Lowe, the Legal Compliance Officer for the Clayton County School District, despite: (1) the fact that she had not been previously identified as a potential witness in its discovery responses or disclosures; (2) that its own 30(b)(6) Representative testified in discovery that the applicable policy was JD–R(1); and (3) that Defendant CCSD had admitted in its responses to Plaintiff's interrogatories that JD–R(1) constituted the applicable school district search policy. Plaintiff therefore moved to strike the Declaration of Latasha Lowe and the newly offered Student Handbook provision touted by CCSD as its official policy regarding student searches as the time the 2011 searches were conducted. Plaintiff does not object to the other documents attached to Ms. Lowe's Declaration.

In response to the motion to strike, CCSD asserts that any implication that the Student Handbook attached to Ms. Lowe's declaration was the applicable policy was

inadvertent and that nothing in her declaration "was intended to contradict the fact that Board Policy JD–R(1) was in existence at the time of the search at issue." (Resp. at 3.) CCSD's position and its willingness to dissemble is troubling after having given interrogatory answers and binding admissions that apparently gave no indication that it would rely on the existence of a different policy—which is, in fact, not an actual school board policy. In adopting a new argument based on a wholly different policy statement, the policy issues briefed on summary judgment are out of sync based on CCSD's partial admissions in response to Plaintiff's Statement of Material Fact, which are often evasive and half-truths, at best.

Accordingly, because the undated Student Handbook statement attached to the Lowe Declaration was never produced in discovery and there is no competent evidence, other than Ms. Lowe's untimely Declaration, that the Handbook statement was an applicable District policy during the relevant time period, the Court **GRANTS IN PART** Plaintiff's Motion to Strike [Doc. 137] as to the portions of the Lowe Declaration referring to the Student Handbook in Paragraph 8, as well the portions of paragraphs 6, 7, 9 and 10 offering substantive testimony regarding the other documents attached (beyond those needed to authenticate such documents). As a result, the Court will not consider the undated Student Handbook attached as Exhibit 2 to the Lowe Declaration or Defendant CCSD's argument regarding the applicability of that "policy" statement.

### B. Liability of Assistant Principal McDowell for Strip Search of D.H.

Plaintiff seeks summary judgment in his favor arguing that the strip search conducted by McDowell on February 8, 2011

violated D.H.'s Fourth Amendment constitutional rights because "[d]ecisions of the U.S. Supreme Court and the Eleventh Circuit clearly establish that school administrators cannot strip search a student unless the strip search is likely to uncover contraband that poses an imminent danger based on a reasonable belief that the student possesses that contraband beneath his underwear." *See Safford Unified School Dist. No. 1 v. Redding,* 557 U.S. 364, 129 S.Ct. 2633, 174 L.Ed.2d 354 (2009); *Thomas ex rel. Thomas v. Roberts,* 261 F.3d 1160 (11th Cir.2001), *vacated,* 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 829 (2002), *reinstated,* 323 F.3d 950 (11th Cir. 2003). Plaintiff asserts that the strip search was unconstitutional for two reasons:

(1) *The strip search was not justified at its inception:* As McDowell had no information that D.H. individually possessed marijuana under his underwear, the strip search was not justified at its inception.

(2) *The search as actually conducted was excessively intrusive and not reasonably related in scope to the circumstances justifying the search:* Even if McDowell had received information that D.H. possessed marijuana in his underwear, the scope and nature of the search he actually conducted was far more intrusive than permissible in light of the age of the student and the specific circumstances presented. Forcing D.H. to expose his genitalia in the presence of other students was entirely unnecessary where the objective of the search could have been fully achieved by (a) asking D.H. to fold over the waistband of his boxer shorts as this would have revealed whether he possessed marijuana underneath the boxer shorts or (b) conducting the search in the privacy of a restroom, as requested by D.H.

*See New Jersey v. T.L.O.,* 469 U.S. 325, 341–42, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (setting out two part inquiry to assess constitutionality of student searches and reasoning that scope will be permissible when it is "not excessively intrusive in light of the age and sex of the student and the nature of the infraction"). Plaintiff does not appear to contest the initiation of a search of D.H. limited to his bookbag and outer clothing. Rather, it is the invasiveness of the strip search which is at issue here.

McDowell opposes Plaintiff's motion and seeks summary judgment in his favor, asserting the defense of qualified immunity. Essentially, McDowell contends that the Supreme Court's decision in *Safford* does not clearly establish that the strip search of D.H. was unconstitutional. Characterizing the strip search of D.H. in front of all males as "a minimal intrusion" justified in an extreme scenario, McDowell argues that the search was not unreasonable where he was confronted with a combination of both a severe danger to students from the power of the drugs involved and their quantity along with specific knowledge that this type of drug would be hidden in a male student's underwear. According to McDowell, because marijuana had been found in a book bag of one student, the sock of another, and the underwear of the third student, it was reasonable to search D.H. in all those locations to find a possible other source of marijuana.

### 1. *Legal Standards Governing Student Searches*

■ The Fourth Amendment's right to be free from "unreasonable searches and seizures" applies to searches of students by public school officials. *New Jersey v. T.L.O.,* 469 U.S. 325, 334, 337, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). In *T.L.O.,* the Supreme Court held that

the accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law.

469 U.S. at 341, 105 S.Ct. 733. Rather, the Supreme Court adopted a reasonableness standard for student searches tailored to "ensure that the interests of students will be invaded no more than is necessary to achieve the legitimate end of preserving order in the schools." *Id.* at 343, 105 S.Ct. 733. The legality of a search of a student depends on the reasonableness, under all the circumstances, of the search. *Id.*

■ The *T.L.O.* Court established a two-pronged test to determine whether a search by school officials is reasonable: first, the court must consider "whether the ... action was justified at its inception," and second, the court must determine whether the search as actually conducted "was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 341–342, 105 S.Ct. 733. A search will be "justified at its inception" where there is "reasonable grounds for suspecting that the search will turn up evidence the student has violated or is violating the law or the rules of the school." *Id.; Thomas,* 261 F.3d at 1166. "The scope of a search will be permissible 'when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.'" *Thomas,* 261 F.3d at 1166 (citing *T.L.O.,* 469 U.S. at 342, 105 S.Ct. 733).

■ It is axiomatic that "people harbor a reasonable expectation of privacy in their private parts" and that "a strip search

represents a serious intrusion upon personal rights." *Justice v. City of Peachtree City,* 961 F.2d 188, 192 (11th Cir.1992); *Thomas,* 261 F.3d at 1168 ("Although students may surrender some expectations of privacy when they enter the schoolhouse door, an expectation that they will be free from forced strip searches is not one of them."). The Eleventh Circuit has repeatedly recognized that "the experience of disrobing and exposing one's self for visual inspection by a stranger clothed with the uniform and authority of the state ... can only be seen as thoroughly degrading and frightening." *Justice,* 961 F.2d at 192 (quoting *John Does 1–100 v. Boyd,* 613 F.Supp. 1514, 1522 (D.C.Minn. 1985)); *Thomas,* 261 F.3d at 1168 (noting highly intrusive nature of search requiring students to drop their pants or lift their skirts and reveal their underwear). Unique circumstances arise in the context of strip searching children[18] who "are especially susceptible to possible traumas from strip searches [and] may be most susceptible to influence and to psychological damage." *Justice,* 961 F.2d at 188; *T.L.O.,* 469 U.S. at 379, 105 S.Ct. 733 ("A search of a child's person ... is undoubtedly a severe violation of subjective expectations of privacy[.]"); *see also Safford,* 557 U.S. at 375, 129 S.Ct. 2633 (noting that "adolescent vulnerability intensifies the patent intrusiveness of exposure" experienced during a strip search). Thus, in the context of school searches the courts have

recognized that "schoolchildren retain a legitimate expectation of privacy in their persons, including an expectation that one should be able to avoid the unwanted exposure of one's body, especially one's 'private parts.'" *Thomas,* 261 F.3d at 1168 (citing *Justice,* 961 F.2d at 191); *see also Safford,* 557 U.S. at 375, 129 S.Ct. 2633 (noting that dramatic difference of "a search exposing the body from the experience of nakedness or near undress in other school circumstances: Changing for gym is getting ready for play; exposing for a search is responding to an accusation reserved for suspected wrongdoers and fairly understood as so degrading that a number of communities have decided that strip searches are never reasonable and have banned them no matter what the facts may be").

For these reasons, the Eleventh Circuit held that strip searches[19] (searches where students are required to take off their clothing and expose their underwear) require school officials to possess individualized suspicion that a violation has been committed before forcing children to remove their clothes. *Id.* at 1169. In 2009, the Supreme Court confirmed that strip searches are "categorically distinct" and require "distinct elements of justification on the part of school authorities for going beyond a search of outer clothing and belongings." *Safford,* 557 U.S. at 374, 129 S.Ct. 2633. The content of the suspicion must match the degree of intrusion. *Id.* at

---

18. *See Evans v. Stephens,* 407 F.3d 1272, 1283 (11th Cir.2005) (holding that decision in *Justice v. Peachtree City* could not squarely govern case involving strip searches of adult detainees because "unique concerns arise with strip searching youngsters").

19. The parties here quibble over the use of the term "strip search" to describe McDowell's search of D.H. However, the Supreme Court and Eleventh Circuit agree that the use of the term "strip search" is an appropriate charac-

terization of the search at issue here. *See Safford,* 557 U.S. at 374, 129 S.Ct. 2633 (indicated that the term "strip search" is a fair way of describing the action of a school official making a student disrobe and pull out his or her underwear); *Thomas,* 323 F.3d at 952 n. 2 (noting that the term "strip search" applies to any search during which a student is required to remove items of clothing even though they are not required to remove all their clothes).

375, 129 S.Ct. 2633. As this Court previously recognized, " 'the categorically extreme intrusiveness of a search down to the body of an adolescent' requires an exacting level of individualized suspicion tied to hard evidence of contraband possession and knowledge that an intrusive search of the intimate parts of the body will actually 'pay off.' The mere spectre of a student's possession of contraband is insufficient to justify such an intrusive search." *D.H. ex rel. Dawson v. Clayton County Sch. Dist.,* 904 F.Supp.2d 1301, 1307 (N.D.Ga.2012) (citing *Safford Unified School District No. 1 v. Redding,* 557 U.S. 364, 375–376, 129 S.Ct. 2633, 174 L.Ed.2d 354 (2009).)

Relying on its similarity to the *Safford* and *Thomas* searches, Plaintiff argues that the strip search of D.H. fails both prongs of the *T.L.O.* reasonableness test. The Court examines the evidence under each prong independently.

### 2. *Whether McDowell's strip search of D.H. was reasonable at its inception*

According to Plaintiff, McDowell's strip search of D.H. was unreasonable at its inception because it was not based on individualized suspicion that D.H. was hiding marijuana in his underwear. In light of the Eleventh Circuit's decision in *Thomas* requiring that school officials possess individualized suspicion in order to conduct a strip search, Plaintiff contends that school "officials cannot strip search a child on grounds that some child—perhaps a different child—engaged in wrongdoing." (Pl.'s Br. at 15 (citing *Thomas,* 261 F.3d at 1169).) *Thomas* involved the mass strip search of a class of fifth grade students by two teachers for a missing envelope containing $26. The boys were taken into the boys' bathroom in groups of four or five at a time by a male police officer assigned to the school and asked to drop their pants.

Some of the boys dropped both their pants and their underwear. The girls were taken into the girls' bathroom in groups of four or five at a time by their female teacher and asked to lower their pants and lift their dresses or shirts. Most of the girls were asked to lift their bras and expose their breasts. The Eleventh Circuit held that this mass strip search, without individualized suspicion that the students searched had taken the money, was unreasonable and thus a violation of the Fourth Amendment. 261 F.3d at 1168–69 (finding, in contrast, that cursory search of student—requiring him to pull out pockets of his pants, remove belt, and shake his pants—without removing his clothes was not excessively intrusive and therefore was justified absent individualized suspicion).

Plaintiffs further assert that the Supreme Court's decision in *Safford* established that a student strip search is constitutionally permissible only when the school official is armed with a reasonable belief that the particular student possesses dangerous contraband underneath his or her underwear and a search of the child's genitalia is likely to uncover the contraband. (Pl's Br. at 17 (citing *Safford,* 557 U.S. at 376, 129 S.Ct. 2633).) The issue addressed by the Court in *Safford* was "whether a 13–year–old student's Fourth Amendment right was violated when she was subjected to a search of her bra and underpants by school officials acting on reasonable suspicion that she had brought forbidden prescription and over-the-counter drugs to school." *Safford,* 557 U.S. at 368, 129 S.Ct. 2633. The Court concluded that "[b]ecause there were no reasons to suspect the drugs presented a danger or were concealed in her underwear" the search violated the Constitution. *Id.*

In *Safford,* school officials had been informed by a student, Jordan, that he had been given a pill by another student, Mar-

issa Glines, and that students were planning to take the pills at lunch. Jordan handed over the pill he had received from his classmate to the school officials. A week earlier Jordan had informed the school officials that certain students were bringing drugs to school and that he had been sick after taking some pills that he got from a classmate. Glines was pulled out of class and searched. The school officials found various contraband items in a day planner in her possession. A search of her pockets and wallet turned over a blue pill, several white pills, and a razor blade. The school officials determined that the pills were prescription and over the counter pain relievers banned under school rules without advance permission. When asked where the pills had come from, Glines identified Savana Redding. Glines denied knowing anything about the day planner and its contents. The school officials did not ask Glines any followup questions to determine whether Redding was in present possession of the pills or where she might be hiding them. Glines was then subjected to a search of her bra and underpants, but no additional pills were found on her.

Redding was then called to the assistant principal's office and shown the day planner which contained knives, lighters, and a cigarette. Redding admitted that the planner was hers, but denied ownership of any of the items in the planner which she had previously lent to Glines. The assistant principal then showed Redding the pills, asked her if she knew anything about them, and informed her that he had received a report that she was giving these pills to other students. Redding denied both knowing where the pills came from and the accusation that they were hers, and agreed to let the school officials search her belongings. A search of Redding's backpack revealed nothing. At that point, Redding was taken to the school nurse to have her clothes searched for pills. Redding was asked to remove her outer clothes, to pull her bra out and to the side and shake it, and to pull out the elastic on her underpants, thus exposing her breasts and pelvic area. No pills were found on Redding.

Under the first prong of *T.L.O.'s* reasonableness analysis, the *Safford* Court found that the school officials had reasonable suspicion to justify a search of Redding's backpack and outer clothing based on Glines's statement that the pills came from Redding as "sufficiently plausible to warrant suspicion that [Redding] was involved in pill distribution." *Safford*, 557 U.S. at 373–74, 129 S.Ct. 2633. The Court reasoned that the information possessed by the assistant principal prior to the search of Redding's clothes and backpack was sufficient because: (1) Redding's admission that she had lent Glines her day planner established that the two of them were friends, (2) there were other reports of the girls' relationship from staff members who had identified them as part of a rowdy group at an earlier school dance during which alcohol and cigarettes were found in the girls' bathroom, and (3) there was reason to connect the girls with this contraband based on statements by Jordan that he had been to a party at Redding's house where alcohol was served. *Id.* at 372, 129 S.Ct. 2633.

With respect to the subsequent strip search, however, the Court found that the school officials lacked reasonable suspicion to search Redding's underwear where there was no "indication of danger to the students from the power of the drugs or their quantity" and there was no reason to believe that Redding was carrying pills in her underwear. *Id.* at 376, 129 S.Ct. 2633. Despite the discovery of a handful of pills on Glines, the Supreme Court found that the school officials "had no reason to sus-

pect that large amounts of drugs were being passed around or that individual students were receiving great numbers of pills." *Id.* Additionally, there was no evidence of a general practice of students at the school hiding similar contraband in their underwear, neither Jordan nor Glines had suggested that Redding was hiding pills in her underwear, and the preceding strip search of Glines had not panned out. The Court further noted that the school officials had not even attempted to determine when Glines had allegedly received the pills from Redding and that such a failure on their part "weigh[ed] heavily against any reasonable conclusion that [Redding] presently had the pills on her person, much less in her underwear." *Id.*

■ As an initial matter, although Plaintiff does not appear to challenge McDowell's search of D.H.'s backpack and outer clothing, the Court finds that reasonable suspicion justified those searches. *See Safford,* 557 U.S. at 373–74, 129 S.Ct. 2633 ("If a student is reasonably suspected of giving out contraband [based on a tip from fellow student], she is reasonably suspected of carrying them on her person and in the carryall that has become an item of student uniform in most places today."); *Thomas,* 261 F.3d at 1169–70 (finding search of student's outer clothing was reasonable given general information available to school official that a student in the class had taken the envelope of money and it was not unreasonable for official to conclude that student was a potential suspect); *Rudolph ex rel. Williams v. Lowndes County Bd. of Educ.,* 242 F.Supp.2d 1107, 1119 (M.D.Ala.2003) (holding that search of student's pockets along with the other students in his class in cafeteria while drug-sniffing dogs were led through the cafeteria and that no individualized suspicion was necessary where the intrusion was limited in light of the school's interest

in combating drug use). McDowell was aware that his fellow administrator Ratcliff had been informed that seventh grade students were passing drugs around, that marijuana had been found on at least three students prior to his search of D.H., and that D.H. was specifically named as a student who had marijuana. Up to that point in the string of searches, each student that had been identified to the school officials as having marijuana had in fact been found to be in possession of marijuana. The limited intrusive nature of the searches of D.H.'s backpack, socks, shoes and pant pockets was therefore based on reasonable grounds in light of the administrators' interest in ridding the school of the use of marijuana on campus.

■ However, what may constitute reasonable suspicion for a search of a backpack or pockets may fall well short of reasonableness for a strip search. *See Redding v. Safford Unified Sch. Dist. No. 1.,* 531 F.3d 1071, 1081 (9th Cir.2008), *aff'd in part, rev'd in part sub nom. Safford Unified Sch. Dist. No. 1 v. Redding,* 557 U.S. 364, 129 S.Ct. 2633, 174 L.Ed.2d 354 (2009); *Safford,* 557 U.S. at 374–377, 129 S.Ct. 2633 (finding circumstances that justified searching student's backpack and outer clothing did not also justify searching her bra and underwear); *Cornfield by Lewis v. Consol. High Sch. Dist.,* 991 F.2d 1316, 1321 (7th Cir.1993). The question posed by the parties on summary judgment is whether McDowell had the requisite level of suspicion to extend the scope of the search to a search of D.H.'s underwear and genitalia. In analyzing the "reliable knowledge element of reasonable suspicion," the *Safford* Court initially looked to its cases on probable cause in fleshing out the knowledge component by reviewing (a) the degree to which known facts imply prohibited conduct, (b) the specificity of the information received, and (c) the

reliability of its source. *Id.* at 370–371, 129 S.Ct. 2633 (citing *Adams v. Williams,* 407 U.S. 143, 148, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), *Spinelli v. United States,* 393 U.S. 410, 416–417, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), and *Aguilar v. Texas,* 378 U.S. 108, 114, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964)). The Court acknowledged, however, that "these factors cannot rigidly control [and] that these standards are fluid concepts that take their substantive content from the particular contexts in which they are being assessed." *Id.* at 371, 129 S.Ct. 2633. (internal citations and quotations omitted). *Safford* thus described "the lesser standard for school searches" as requiring "a moderate chance of finding evidence of wrongdoing." *Id.* at 371, 129 S.Ct. 2633; *see also T.L.O.,* 469 U.S. 325, 105 S.Ct. 733 ("Under ordinary circumstances, a search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school.").

In the context of a strip search, however, *Safford* held that requiring a middle school student to remove her clothing and pull her underwear away from her body exposing her breasts and pelvic area to some degree "require[s] distinct elements of justification on the part of school authorities for going beyond a search of outer clothing and belongings." *Id.* at 374, 129 S.Ct. 2633. In order to justify the categorically extreme intrusiveness of a strip search, the search as actually conducted must be reasonably related in scope to the circumstances which justified the interference in the first place. *Id.* at 375, 129 S.Ct. 2633. According to *Safford,* the content of the suspicion must match the degree of the intrusion. *Id.* at 375, 129 S.Ct. 2633. Although the reasonableness inquiry established by *T.L.O.* is analyzed under a two pronged approach, the scope/nature of the search (i.e. a strip search as opposed to a search of personal belongings) bears on the level of suspicion required to justify the search. *See id.; see also Phaneuf v. Fraikin,* 448 F.3d 591, 596 (2nd Cir.2006) (noting that "the reasonableness of the suspicion is informed by the very intrusive nature of a strip search [ ] requiring for its justification a high level of suspicion"). Thus, the Court in *Safford* unequivocally announced that

> the *T.L.O.* concern to limit a school search to reasonable scope requires the support of reasonable suspicion of danger or of resort to underwear for hiding evidence of wrongdoing before a search can reasonably make the quantum leap from outer clothes and backpacks to exposure of intimate parts. The meaning of such a search, and the degradation its subject may reasonably feel, place a search that intrusive in a category of its own demanding its own specific suspicions.

*Id.* at 377, 129 S.Ct. 2633.

 McDowell's expanded search of D.H.—requiring him to remove his pants and underwear—therefore, "demands its own specific suspicions." *Safford,* 557 U.S. at 364, 129 S.Ct. 2633; *Phaneuf,* 448 F.3d at 597 (quoting Seventh Circuit's decision in *Cornfield* and noting that "as the intrusiveness of the search of a student intensifies, so too does the standard of Fourth Amendment reasonableness"). The Court must examine the totality of the circumstances surrounding the search to determine whether reasonable and individualized suspicion existed for McDowell to subject D.H. to a strip search in light of the facts known to him prior to the search. *See T.L.O.,* 469 U.S. at 341, 105 S.Ct. 733; *Thomas,* 261 F.3d at 1166 (citing *T.L.O.,* 469 U.S. at 341, 105 S.Ct. 733); *Foster v. Raspberry,* 652 F.Supp.2d 1342, 1348–49

(N.D.Ga.2009) ("The standard for determining the validity of a search by school officials is the 'reasonableness, under all the circumstances, of the search.' ")

McDowell points to four factors he contends created the reasonable suspicion required to justify his strip search of D.H.: (1) the fact that all three students previously identified had been found to be in possession of marijuana, (2) one of those students had stashed marijuana in his underwear, (3) D.H. had been specifically identified by (at least) one of those students to also have been found with marijuana on him, and (4) the dangerous nature of marijuana presence in a school with elementary grade levels located in the same building. The Court examines each of these bases in turn.

First, the fact that other students were found with marijuana amounts to generalized suspicion and does not alone justify strip searching D.H. *See Safford*, 557 U.S. at 374–377, 129 S.Ct. 2633 (finding strip search unreasonable after pills were found on plaintiffs classmate who identified plaintiff as giving her the pills); *Thomas*, 261 F.3d at 1169 (holding that strip search of student must be based on individualized as opposed to generalized reasonable suspicion).

Second, questions surrounding the specificity of McDowell's actual knowledge regarding whether another student had hidden marijuana in his underwear cast doubt on McDowell's justification for searching D.H.'s underwear and inspecting his genitalia. There is no dispute that McDowell was not personally present during the search of T.D., who according to Defendant was found with marijuana in his underwear by Ratcliff. McDowell's knowledge was based on his brief conversation with Ratcliff that a student (or possibly two students) had been found with marijuana in their underwear. The exact content of the conversation, however, is in dispute.

Ratcliff testified that she informed McDowell that as she was conducting a search, the student had "pulled drugs out from what appeared to be his underwear." (Ratcliff Dep. at 57–58.) According to McDowell, he received a call from Ratcliff in his office and she asked him whether he had ever been aware of an incident where a student would hide marijuana in his or her underwear, to which McDowell responded he had not. (McDowell Dep. at 89.) McDowell testified that Ratcliff advised him that one or more students had hidden marijuana in their underwear. (*Id.*) At the time of his deposition, McDowell could not recall specifically whether Ratcliff said the marijuana was found in the student's underwear, his waistband, or his pants. But in his original discovery responses, McDowell indicated that it was his "understanding that marijuana had already been found in the waistband of the underwear of one or both students who had already been searched." (McDowell Dep. at 98; Doc. 138–8 at 3.)

According to McDowell, he was not aware at the time that only one student had been found with marijuana in his underwear and believed that it may have been two students. Yet there is no dispute that this was the first incident either McDowell or Ratcliff had ever personally known of where a student had hidden drugs in his underwear. There is no indication in the record that McDowell, prior to strip searching D.H., inquired further of Ratcliff regarding precisely how many students had been found with marijuana in their underwear and exactly where it was hidden. It appears that McDowell could have easily done this when Ratcliff brought D.H. to Redding's office upon his request. Equally problematic, is that McDowell had no prior direct experience

with students hiding drugs in their underwear. In fact, the only other student strip search conducted by McDowell—prior to the strip search of D.H.—had not paid off. D.V., who had named D.H., had not been found with marijuana hidden in his underwear.

Ratcliff's testimony further casts doubt on McDowell's reliance on the fact that another student had hidden marijuana in his underwear as justification for the strip search of D.H. First, Ratcliff testified that she had never had any issues with D.H. prior to the events of February 8, 2011 where he had been reported as having brought illegal drugs to school. (Ratcliff Dep. at 66.) Second, Ratcliff testified that while one could possibly make the assumption that because some students had marijuana in their underwear that some others might also, she personally did not anticipate that D.H. might also have marijuana in his underwear even after observing T.D. having pulled marijuana from his underwear. (Ratcliff Dep. at 89–90.) Ratcliff's testimony thus calls into question whether a reasonable school administrator would have believed a sufficient basis existed to conduct a strip search of every student accused of being in possession of marijuana, without having obtained any personal information regarding the student to be strip searched, especially where the search of the student's belongings and outer clothing turn up short. *See Safford*, 557 U.S. at 376, 129 S.Ct. 2633.

Third, McDowell relies on a tip from D.H.'s classmate as providing him with reasonable suspicion to conduct the strip search. McDowell argues in his briefing that all three students identified D.H. as

being in possession of marijuana.[20] This assertion is not supported by the record evidence. Although Defendant points to hearsay testimony by R.C. (disputed by T.D.) that T.D. also told Redding and McDowell that D.H. had drugs on him, McDowell unequivocally testified that D.V. was the student who named D.H. McDowell never took the position, either in his deposition or his written report, that any other student identified D.H. as also having drugs. Contrary to Defendant's contention in his Reply brief, there is no undisputed record evidence that R.C. ever identified D.H. to the school officials as having marijuana on him that day.

The record is void of any independent evidence connecting the students searched (other than their naming each other as having marijuana at school that day) as being part of a group of friends or a gang of troublemakers. Neither Ratcliff nor McDowell provided any testimony to that effect. As McDowell had been at the school for only a few months, there is nothing in the record suggesting that he had any knowledge of the students' relationships with one another or that he had seen the boys hanging out together before, during, or after school. With respect to D.V.'s identification of D.H. as also possessing drugs, there is nothing in the record to suggest that McDowell conducted any interview(s) or investigation of D.V. to determine the basis for D.V.'s alleged knowledge as to D.H.'s possession of marijuana (i.e. that the two were friends, that he either gave the marijuana to or received the marijuana from D.H.), whether D.V. had information that D.H. had marijuana with him at school that day, or where D.H. had stashed the drugs. Nor

---

**20.** The Court does not consider Defendant's recitation of certain facts in his Reply brief, but which are not recounted in his statement of undisputed material fact, or in response or reply to Plaintiffs statements of undisputed material facts. *See* L.R. 56.1(B)(1), NDGa. ("The court will not consider any fact ... set out only in the brief and not in the movant's statement of undisputed facts.").

has McDowell pointed to any evidence that he ever consulted with Ratcliff or other administrators to determine if D.H. had any history of drug use or possession at school or other comparable misconduct or close friendship with D.V., T.D. and R.C. *See Phaneuf,* 448 F.3d at 599 (noting that "a student's past history of drug use can be a factor adding to the mix in a school official's decision to conduct a strip search"); *Cornfield,* 991 F.2d at 1322 (considering series of recent incidents involving drugs as one factor in creating reasonable suspicion to justify strip search).

■■■ A number of courts have held that information or tips provided by fellow students as informants can serve as the basis for reasonable suspicion that a student may be engaged in illegal activity where there is some other evidence of corroboration. *See Safford,* 557 U.S. at 373, 129 S.Ct. 2633 (finding statement by Glines was sufficiently plausible to warrant suspicion that Redding was involved in pill distribution where other information corroborated a relationship between the two girls and Redding had admitted that day planner found on Glines was in fact hers); *see also C.B. by and through Breeding v. Driscoll,* 82 F.3d 383, 388 (11th Cir.1996) (finding reasonable grounds for search existed based in part on tip from fellow student that plaintiff carried drugs "in his big old coat," corroborated by administrators' observance that plaintiff did in fact have such a coat in his possession when the search was initiated); *Roy ex rel. Roy v. Fulton Cnty. Sch. Dist.,* 509 F.Supp.2d 1316, 1322 (N.D.Ga.2007) (relying on tip from fellow student who was allegedly involved in the theft that plaintiff had stolen an MP3 player out of another student's locker as support for dismissing plaintiff's Fourth Amendment claim for unreasonable search and seizure); *Rudolph ex rel. Williams v. Lowndes Cnty. Bd. of Educ.,*

242 F.Supp.2d 1107, 1114–1115 (M.D.Ala. 2003) (finding that individualized suspicion was met where another student had identified plaintiff which was corroborated by fact that the drugs were found at the table at which plaintiff was seated).

Plaintiff criticizes McDowell's reliance on D.V.'s statement in light of the fact that D.V. had a known criminal record and a record of bringing drugs to school. McDowell compelled D.H. to submit to a search of his underwear and genitals based on the tip from D.V. who neither explained how he knew about D.H.'s possession of marijuana (i.e. that he either supplied it or received it from D.H.) and from whom McDowell made no inquiries to determine his actual scope of knowledge regarding the whereabouts of the marijuana allegedly possessed by D.H. that would lend support to the reliability of D.V.'s tip-off. *See Safford,* 557 U.S. at 376–77, 129 S.Ct. 2633 (noting that school officials' failure to investigate the details of student's accusation that plaintiff had given her the drugs prior to conducting strip search "weigh[ed] heavily against any reasonable conclusion that [plaintiff] presently had the pills ... in her underwear").

Nor is there any corroborating evidence in the record to indicate that D.H. had marijuana on his person, or any assertion by any student that it could be found in his underwear. *See Safford,* 557 U.S. at 373, 129 S.Ct. 2633 (finding no corroborating evidence to support a suspicion that Redding was hiding the pills in her underwear beyond the administrator's universal belief that students hide contraband under their clothing); *Driscoll,* 82 F.3d at 388 (11th Cir.1996) (finding that tip was specifically corroborated by other evidence tying location of drugs hidden in clothing of plaintiff); *Lowndes Cnty. Bd. of Educ.,* 242 F.Supp.2d at 1114–1115 (finding that evidence corroborated tip that student was in

possession of drugs where drugs were found in close proximity to plaintiffs person); *see also Phaneuf*, 448 F.3d at 592–94 (holding that a strip search violated the Fourth Amendment, even in light of the fact that a fellow student's tip specifically accused Phaneuf of hiding marijuana "down her pants" because no evidence showed that the student-informant was reliable in general, nothing corroborated the specific tip, and Phaneuf was not known to have previously been involved in drug use at school).

The parties dispute whether any of the other students corroborated D.V.'s accusation, and both R.C. and T.D. deny that either of them informed McDowell that D.H. was also in possession of marijuana. In fact, both R.C. and T.D. testified that they told McDowell that D.H. did not have drugs on him. While McDowell may not have been required to take their word for it, assuming their statements were made prior to D.H.'s strip search, their testimony indicates the types of reasons why McDowell should have conducted an additional investigation into the veracity of D.V.'s statement prior to proceeding with an invasive strip search.

However, after receiving the tip from D.V., McDowell apparently did not investigate, corroborate, or otherwise substantiate it prior to ordering the strip search. McDowell did not follow-up with Ratcliff or other administrators at the school to determine whether D.H. had any ties to the other students or had been in trouble before for similar offenses, nor did he first search D.H.'s locker or desk prior to going straight to his underwear. Even viewing all these factual disputes in the light most favorable to Defendant, the record establishes that rather than acting on reasonable individualized suspicion following a properly informed inquiry, McDowell rushed to judgment and rashly reacted to the perceived "severity of the situation." Additionally, had McDowell paused and questioned Ratcliff about her actual knowledge of the extent of the students' practice of hiding marijuana in their underwear— whether it was one or more students— McDowell could have easily discovered that in fact it was only one student.

Finally, the Court acknowledges that some courts weigh drugs "more heavily in the *T.L.O.* balancing than other interests, such as the recovery of stolen money to preserve order." *Rudolph ex rel. Williams v. Lowndes County Bd. of Educ.*, 242 F.Supp.2d at 1116. Despite McDowell's assertion, there is no evidence of the exact amount of marijuana found during the February 2011 searches, much less that the amount of marijuana found on the three students (described generally by Officer Redding as less than one ounce each) was of a sufficient quantity to pose an extreme danger to other students in the school. The amounts found on T.D. and R.C. were described as being a small package the size of a deposition exhibit sticker or nickel, and a plastic bag and 2 joints, while the amount found on D.V. was contained in an Altoids mint tin (which may have been more than that found on the other students). McDowell characterizes the marijuana possession as an extreme criminal violation, yet he has not provided any argument or evidence whether the possession of marijuana by the students in this case would have constituted a misdemeanor offense (under O.C.G.A. § 16–13–2 for possession of one ounce or less) or as a felony offense (under O.C.G.A. § 16–13–30 for possession with intent to distribute). Even after locating marijuana on the other students, there was no individualized basis for McDowell to suspect that D.H. was hiding marijuana in his underwear. Nor was there any basis on which to suspect that D.H. was distributing marijuana to other students where D.V. was the student

who had been previously identified as the source of the marijuana being passed around in the classroom that morning. While the parties agree that D.V. identified D.H. as also having marijuana on him, there is no indication he accused D.H. of distributing marijuana to other students. At a minimum there is a question of fact as to the extent of danger posed by the small amount of marijuana recovered during the student searches.[21]

Most importantly, the factual disputes noted above are immaterial to the question of whether McDowell had the requisite level of suspicion to launch the strip search in the first place. The Court finds the totality of the evidence surrounding the search, even construed in McDowell's favor, is insufficient to establish the highly specific level of individualized suspicion necessary to justify the strip search of D.H. The evidence in this case is not like that in *Safford* where school officials had determined at the outset that Glines and Redding were friends, were both part of a rowdy group at the school's dance during which alcohol and cigarettes were found in the girls' bathroom, and that Redding had thrown a party where alcohol had been served. *Safford*, 557 U.S. at 373, 129 S.Ct. 2633 (finding such evidence sufficiently plausibly to warrant suspicion that Redding was involved in pill distribution and thus justifying search of her outer clothing and belongings only). There is no evidence attributing T.D., R.C., and D.V.'s marijuana possession to D.H. on which McDowell reasonably could have relied to justify making the quantum leap from D.H.'s outer clothes and backpack to a search of his underwear and the forced

exposure of his genitals. *See Safford,* 557 U.S. at 377, 129 S.Ct. 2633. McDowell failed to make a reasonable effort under the circumstances to establish the high level of suspicion necessary before engaging in a highly invasive search of a twelve year old boy requiring him to pull down his pants and expose his genitals for visible inspection. Without further investigation, the content of McDowell's suspicion failed to match the highly intrusive nature of the strip search conducted. *Id.* at 376, 129 S.Ct. 2633.

Nor is there any sense of urgency apparent from the record to warrant McDowell proceeding with a strip search in this manner in the absence of individualized suspicion that D.H. was hiding marijuana in his underwear. McDowell points to no evidence that the situation was such that he was required to immediately demand that D.H. strip down to his underwear after the initial clothed search failed to pay off. The Court therefore finds that it would not have been burdensome for McDowell to briefly halt the search in order to firm up the basis of his suspicions and require D.H. to sit and wait in the office so he could quickly investigate the suspected facts to ensure the content of the suspicion would match the degree of the intrusion imposed by the search. This is not a question of 20/20 hindsight in and emergency law enforcement context—but plain common sense.

Accordingly, because the strip search of D.H. was conducted without reasonable individualized suspicion, it was not justified at its inception and was thus unreasonable under the Fourth Amendment. Plaintiff is

---

**21.** The Court's discussion here is not meant to downplay the significant interest school officials have in protecting their students from the harmful effects of drugs in school. The Court must, however, evaluate the record evidence as to nature of the danger at issue in

the case through the prism of the Supreme Court's decision in *Safford* establishing constitutional limitations on strip searches by placing them in "a category of [their] own demanding [their] own specific suspicions." 557 U.S. at 377, 129 S.Ct. 2633.

therefore entitled to summary judgment under prong one of the *T.L.O.* reasonableness test unless the law at the time of the search was not clearly established.

3. *Whether the law was clearly established that McDowell's strip search would violate D.H.'s Fourth Amendment rights*

 Having found a constitutional violation as to the reasonableness of the search at its inception, the Court must determine whether the law clearly established that McDowell's initiation of the strip search under the circumstances of this case was not supported by reasonable and individualized suspicion that D.H. possessed marijuana in his underwear. As the Supreme Court in *Safford* noted,

> [a] school official searching a student is 'entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment' *Pearson v. Callahan*, 555 U.S. [223, 243–44], 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). To be established clearly, however, there is no need that 'the very action in question [have] previously been held unlawful.' *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). The unconstitutionality of outrageous conduct obviously will be unconstitutional, this being the reason, as Judge Posner has said, that '[t]he easiest cases don't even arise.' *K.H. v. Morgan*, 914 F.2d 846, 851 (7th Cir.1990). But even as to action less than an outrage, 'officials can still be on notice that their conduct violates established law ... in novel factual circumstances.' *Hope v. Pelzer*, 536 U.S., 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

*Safford,* 557 U.S. at 377, 129 S.Ct. 2633. Qualified immunity does not provide officials with a license to engage in lawless conduct. *Harlow v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Rather, "[w]here an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action." *Id.* (footnote omitted). Qualified immunity thus shields government officials performing discretionary functions [22] from individual liability for civil damages but only "insofar as their conduct does not violate clearly established rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. 2727.

 In support of his qualified immunity defense, McDowell asserts that the Supreme Court's decision in *Safford* dictates that summary judgment should be granted in his favor. According to McDowell, *Safford* offers nothing more than a generalized standard regarding the limitations on strip searches and does not establish that his conduct was obviously unconstitutional in light of differences in the circumstances surrounding the *Safford* search from the search at issue here.

The Supreme Court's decision in *Safford* essentially confirmed what was already the clearly established law in this Circuit following *Thomas.* In light of its finding that it had failed to make sufficiently clear in its prior statement of the law its view of school strip searches, the *Safford* Court was careful to point out that it was now

> mak[ing] it clear that the *T.L.O.* concern to limit a school search to reasonable scope requires the support of reasonable suspicion of danger or of resort to un-

---

**22.** Plaintiff does not dispute that McDowell was performing a discretionary function at the time of the search.

derwear for hiding evidence of wrongdoing before a search can reasonably make the quantum leap from outer clothes and backpacks to exposure of intimate parts. The meaning of such a search, and the degradation its subject may reasonably feel, place a search that intrusive in a category of its own demanding its own specific suspicions.

*Safford*, 557 U.S. at 377, 129 S.Ct. 2633. In declaring the strip search unconstitutional, the Supreme Court in *Safford* found that once the initial clothed search of the student yielded no results, there was insufficient evidence upon which school officials could reasonably base their intrusive strip search, especially in the absence of any evidence of a general practice among the students at the school of hiding contraband in their underwear. *Safford*, 557 U.S. at 376, 129 S.Ct. 2633 (rejecting school's suggestion that it is a universal truth that "students ... hid[e] contraband in or under their clothing," based on citation of a smattering of cases of students with contraband in their underwear). As Plaintiff aptly asserts, "[i]f *Safford* stands for one proposition, it is that a school official needs far more suspicion that a particular child possesses contraband underneath his or her underpants before he can strip search that child." (Pl.'s Br. at 18.) *Safford*, along with *Thomas*, clearly established that a generalized belief that some students might have hidden contraband in their underwear (as here, based on the observation that one student out of three searched had pulled marijuana from the waistband of his underwear) is not enough to justify the quantum leap to a strip search of another student without specific

individualized suspicions that a search of his underwear will pay off.

McDowell argues that he believed he could search D.H.'s underwear "based upon information that two students had hidden marijuana in their underwear," that underwear "was a place where something could be hidden," and that "others could have it in their underwear as well." (Def.'s Br. at 8–9.) Despite his testimony that he had never been involved in a situation previously where a student had hidden marijuana in his underwear, (McDowell Dep. at 48), McDowell's argument on summary judgment implies that he was faced with a practice among at least two of these students of hiding marijuana in their underwear. To the extent that McDowell believed that possibly more than one student had hidden marijuana in his underwear, *Thomas* and *Safford* put him on notice that he was obligated to stop and investigate the specific basis for his suspicion prior to initiating a strip search of yet a third student. While the information McDowell understood he received from Ratcliff may have reasonably prompted a concern that other students may possibly also have stashed drugs under their clothing, there was no independent evidence tying the conduct of those students specifically to D.H. beyond D.V.'s uncorroborated tip. At the point his search of D.H.'s backpack and outer clothes yielded no marijuana, the law in *Thomas* and *Safford* clearly demonstrate that McDowell's next step should have been to stop and conduct further inquiry of Ratcliff, other administrators, and the students themselves as would be necessary to establish a reasonable connection between marijuana and the likelihood of D.H.'s hiding marijuana in his underwear.[23] *Safford*, 557 U.S. at 376, 129

---

**23.** While *Safford* may have arguably left open the question of what evidence is sufficient to establish a general practice among a group of students of hiding marijuana in their under-

wear, the Court's decision was clear that where an administrator fails to undertake an investigation into whether a particular stu-

S.Ct. 2633 (finding record weighed heavily against any reasonable conclusion that the plaintiff had the pills on her or in her underwear where there was no evidence of any general practice among the middle school students of hiding that sort of thing in underwear, no other student had suggested that the plaintiff had hidden the pills in her underwear, and the school official failed to conduct follow-up investigation of student informant about details of plaintiffs involvement in pill distribution at school); *Thomas*, 261 F.3d at 1169 (finding no reason that the school's interests would have been jeopardized if administrators were required to possess individualized suspicion before forcing the children to remove their clothing).

*Safford* unequivocally makes clear that, "the categorically extreme intrusiveness of a search down to the body of an adolescent requires some justification in suspected facts, general background possibilities fall short; a reasonable search that extensive calls for suspicion that it will pay off." *Safford*, 557 U.S. at 376, 129 S.Ct. 2633. However, it is clear that McDowell did nothing to shore up his suspicion that D.H. might be hiding marijuana in his underwear. He did not first search his locker, desk or classroom. Nor did he question D.H.'s teacher whether he had noticed any suspicious behavior that day. McDowell made no effort to confirm his understanding of the "severity of the situation" or to explore D.H.'s possible involvement by following up with Ratcliff or the other students involved. Rather, McDowell relied solely on a brief conversation with Ratcliff regarding the nature of the student searches conducted prior to his being summoned for his assistance in the searches. If McDowell genuinely believed that two of the three students searched prior to D.H. had been found with marijuana tucked in

their underwear, he was still constitutionally obligated to conduct an investigation to verify that the content of his suspicion matched the degree of intrusion before making the quantum leap to a strip search of a third student about whom he knew almost nothing. As a result of the profound psychological impact of a strip search on a twelve year old boy—as borne out by the evidence in this case that D.H. left the school altogether and now refuses to change clothes in the locker room in front of his teammates—the Fourth Amendment clearly requires that some inquiry be made before requiring a student to pull down his pants in public (or private) and expose his intimate parts.

Accordingly, as the law was clearly established that McDowell lacked reasonable individualized suspicion to strip search D.H., he is not entitled to qualified immunity under prong one of *T.L.O.* requiring that the strip search be reasonable at its inception.

4. *Whether the search as actually conducted was reasonably related to the objectives of the search and not excessively intrusive*

■ Even assuming McDowell had the requisite level of suspicion that D.H. possessed marijuana in his underwear, Plaintiff asserts that the scope of the strip search fails the second prong of the *T.L.O.* reasonableness test because it was entirely unnecessary for McDowell to force D.H. to pull down his boxer shorts and expose his genitalia in front of other students. A search ordered by a school official, even if "justified at its inception," crosses the constitutional boundary if it becomes "excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Safford*, 557 U.S. at 381, 129 S.Ct.

dent may have participated in such a practice,

a strip search will not be justified.

2633 (quoting *T.L.O.*, 469 U.S. at 342, 105 S.Ct. 733).

Plaintiff contends that the forced exposure of D.H.'s genitalia was completely unrelated in scope to the reason McDowell searched D.H. and that there was no reason to search D.H.'s genitalia because he was wearing boxer shorts (underwear that has elastic at the top, but is loose below the waist). A bag of marijuana would likely have fallen through his boxers to the floor if not held up by the waistband. Thus, McDowell could have asked D.H. to fold over the waistband of his boxer shorts to reveal any presence of hidden marijuana in his underwear. In addition, McDowell could have mitigated, to some extent, the intrusiveness of the search by acquiescing to D.H.'s request to conduct the search in the privacy of the bathroom rather than in front of three of his peers. McDowell does not offer any argument or attempt to point to any evidence to suggest that the scope of the strip search was not excessively intrusive under the circumstances he faced including D.H.'s age, the nature of the alleged infraction, or the nature of the interest justifying the search.

Although the parties dispute whether D.H. was forced to completely remove his underwear as D.H. contends, for purposes of considering Plaintiffs summary judgment motion the Court will accept McDowell's testimony that D.H. was required to "pull his underwear away from his body and in a down motion," thus exposing D.H.'s genitals for McDowell's observation. The search of D.H. "down to his body" was conducted in the same manner as the unconstitutional search in *Safford* in which Redding was asked to remove her clothes down to her bra and underwear and then "pull out" her bra and the elastic band on her underpants exposing her breasts and pelvic area to some degree. *See Safford*,

557 U.S. at 374, 129 S.Ct. 2633. It thus appears from the record in this case that there was no need to examine D.H.'s genitals in light of the type of boxers he was wearing and there is no evidence McDowell noticed a bulge in D.H.'s pants or underwear. Indeed, McDowell testified that he asked D.H. to "pull his underwear away from his body and in a down motion just in case if [sic] he had anything in his—on his person, it would fall to—fall to the ground." (McDowell Dep. at 120). It is undisputed, however, that instead of limiting the search to an observation of whatever might have fallen out of the boxer shorts to the ground, McDowell physically observed D.H.'s genitals when D.H. was required to pull his boxers out and down. (*Id.* at 120–121 (stating that from where he was standing he could see D.H.'s genitals).)

However, setting aside the question whether it was necessary for D.H. to pull down his underwear when asking him to merely fold over the waistband of his boxers would have been sufficient to reveal the presence of hidden marijuana, McDowell's refusal to allow the search to proceed in the privacy of the bathroom was unreasonable under the circumstances. McDowell provided no legitimate rationale for the need to conduct the strip search in the presence of three of D.H.'s peers, other than he just did not see that as an option at the time. McDowell does not assert and the record is void of any indication that the circumstances required that the search be immediately conducted in front of others rather than in private. McDowell could have summoned Ratcliff or the other assistant principal at EWA in charge of the middle grade students to monitor R.C., T.D., and D.V. while he and Redding conducted the search of D.H. in the bathroom. Although Defendant quibbles over the degree of intrusiveness of

such a search where the other students may not have observed D.H.'s forced exposure of his genitals, the Supreme Court has declined to define "strip search and its Fourth Amendment consequences in a way that would guarantee litigation about who was looking and how much was seen." *See Safford,* 557 U.S. at 374, 129 S.Ct. 2633. The Court finds that, like in *Safford,* "the content of the suspicion failed to match the degree of intrusion" of requiring D.H. to strip down and expose his genitals to a search in front of his classmates. *See id.; see also Lowndes Cnty. Bd. of Education,* 242 F.Supp.2d at 1120 (concluding that requiring one student to strip to his underwear in a public parking lot was excessively intrusive but that search of another student required to pull his underwear down to his knees was reasonable where it was conducted in private room); *cf. Justice v. City of Peachtree City,* 961 F.2d 188, 193 (11th Cir.1992) (finding strip search of juvenile arrestee reasonable where the officers limited the manner of the search by having members of the same sex perform the search and using a room where only the officers and the plaintiff were present to conduct the search).

Because a strip search is more invasive and potentially psychologically harmful than other searches, especially when conducted on an adolescent child, it must be limited to the least intrusive means possible. Where the search could reasonably be conducted without requiring a student to fully expose himself, a strip search is too intrusive. The availability of less intrusive alternatives to a highly invasive strip search, combined with a lack of evidence that less intrusive alternatives would undermine the school's legitimate interests, demonstrates that the extensive scope of the strip search, as actually conducted in this case, was a rash and exaggerated response to the school's legitimate concerns.

As there are no material disputed facts that pose a jury question regarding the scope of the search and its lack of privacy, the Court finds that the evidence indisputably shows that the strip search, as conducted, was excessively intrusive and not reasonably limited in scope as required under *T.L.O. See Thomas,* 261 F.3d at 1166 (citing *T.L.O.,* 469 U.S. at 342, 105 S.Ct. 733); *Safford,* 557 U.S. at 375–77, 129 S.Ct. 2633. D.H. did not shed his constitutional rights at the schoolhouse door. *Thomas,* 261 F.3d at 1168. He thus retained some reasonable expectations of privacy in the school context and the exceptionally invasive search performed requiring him to shed his clothes in public constituted a substantial invasion of his Fourth Amendment interests. *Safford,* 557 U.S. at 375–77, 129 S.Ct. 2633. Although the Court has found that D.H.'s Fourth Amendment rights were violated by the manner in which the strip search was conducted, McDowell may still be entitled to qualified immunity if the law was not clearly established that the scope of the search was unreasonable.

5. *Whether the law was clearly established that the scope of the search was unreasonably intrusive under the circumstances*

 The Court must now determine whether the law clearly established that the strip search, as conducted, publicly in front of other students was excessively intrusive and not reasonably related in scope to the circumstances justifying the initiation of the search. For the reasons discussed herein, the Court finds that McDowell had fair notice that the scope of the search, as conducted, was unreasonably intrusive where he (a) required the student to pull down his pants and submit to a search of his genitals in front of three of his classmates, and (b) refused to con-

duct the search in the privacy of the bathroom. McDowell is therefore not entitled to qualified immunity.

McDowell's argument in support of his qualified immunity defense focuses solely on the first prong of *T.L.O.* as to whether he had reasonable suspicion to conduct a search of D.H.'s underwear and fails to address whether the scope of the search as conducted was also reasonable.[24] As thoroughly explained above, *Safford* and *Thomas* clearly established the law regarding the constitutional limitations of strip searches in the school context. There is no doubt that McDowell's strip search—requiring D.H. to strip down to his underwear and expose his genitals in front of three other students when he could have conducted the search in the privacy of the bathroom—was an unreasonably intrusive invasion of D.H.'s Fourth Amendment rights.

As Plaintiff points out, the strip search conducted in *Safford* is materially indistinguishable from the strip search conducted here. The most significant difference for purposes of this Court's analysis, and a fact completely ignored by Defendant, is that the unconstitutional search in *Safford* occurred privately in the school nurse's office whereas the search of D.H. here occurred in front of three of his peers. McDowell's attempt to distinguish the facts of *Safford* and this case is unavailing. In *Safford*, the student strip search was based on suspicion of the student possessing and distributing prescription and over-the-counter pain relievers banned from school without prior authorization. Here, McDowell strip searched D.H. for possible marijuana possession. Both the possession of prescription pain relievers without a prescription and possession of a small quantity of marijuana might be deemed a

potential risk to students and potentially be charged as a minor criminal offense. As the Court in *Safford* recognized "while just about anything can be taken in quantities that will do real harm," by the point McDowell conducted the strip search, he reasonably should have understood that the quantity of possible marijuana that could have been concealed in D.H.'s underwear was minimal, considering the lack of evidence that D.H.'s pants appeared to be bulging. *Safford*, 557 U.S. at 376, 129 S.Ct. 2633. It should have therefore been clearly apparent to McDowell that the lack of an extreme danger to students posed by D.H.'s potential possession of a small amount of marijuana did not warrant the quantum leap to an extremely intrusive strip search in front of other students.

The Eleventh Circuit clearly established in *Thomas* that a *public* strip search is a highly intrusive unconstitutional invasion of privacy except where supported by individualized suspicion and evidence that the activity poses "an extreme threat to school discipline or safety." 261 F.3d at 1169. The Court acknowledges that the intrusiveness of the search is assessed by the specific risk posed and that the danger posed by a student's possession of marijuana may be viewed to some extent as greater in magnitude than the danger posed by student theft. However, in light of *Thomas*, a reasonable school official would have been aware that there was no reason to conclude that the school's interest in maintaining safety and discipline and in ferreting out the presence of illegal marijuana would have been immediately jeopardized if McDowell conducted a less intrusive search. *Id.* McDowell's concern could have been equally satisfied, at the very least, by allowing D.H. simply to snap open the waistband of his boxer shorts,

---

24. Plaintiff therefore argues that Defendant has waived his right to challenge the constitu-

tionality of the search under *T.L.O.*'s second prong.

allowing any drugs to drop to the floor, or alternatively to have searched D.H. in a private restroom. The Court finds that *Safford* and *Thomas* were sufficiently on point to put school officials on notice that a search of the type conducted here was a violation of a student's constitutional rights under the Fourth Amendment.

 Finally, as far back as the 1992 decision in *Justice v. City of Peachtree City*, the Eleventh Circuit has recognized a core principal of Fourth Amendment law that the serious intrusion on privacy affected by a strip search of a juvenile requires that the search be conducted in private.[25] *See Justice*, 961 F.2d at 191–193. Such a search should "instinctively give[ ] [officials] the most pause." *Id.* at 193 (quoting *Bell v. Wolfish*, 441 U.S. 520, 558, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). *Justice* therefore put McDowell on notice that even if reasonable suspicion to conduct the strip search existed, the search would only withstand constitutional muster if carried out in the least intrusive manner possible, and at a minimum must be conducted in a private room "where only the participants were present to conduct the search." *Id.; see also Thomas*, 261 F.3d 1160 (declaring unconstitutional the mass strip search of students who were taken to the bathroom in groups of 4 and 5 at a time and "required to lift their bras and reveal their breasts to their teacher and other children").

The Court finds that McDowell had fair warning that his conduct in strip searching D.H. in front of three of his peers was unconstitutional, given that the Supreme Court and Eleventh Circuit have held that searches under materially similar facts violated the Fourth Amendment. As the strip search was conducted in an unreasonable manner and the law was clearly established at the time of the search, McDowell is not entitled to qualified immunity as to the invasive scope of the search and the manner in which it was conducted.

Accordingly, having found that the law in 2011 was clearly established that McDowell's invasive strip search of D.H. without individualized suspicion and in front three other students violated his Fourth Amendment rights, the Court **DENIES** McDowell's Motion for Summary Judgment [Doc. 112] and **GRANTS** Plaintiffs Motion for Partial Summary Judgment [Doc. 116].

6. *Whether McDowell is entitled to Official Immunity as to Plaintiff's State Law Claims*

 McDowell contends he is entitled to summary judgment as to Plaintiff's state law claims because he is entitled to official immunity under Art. I, Sec. II, Par. IX of the Georgia Constitution. "[S]chool employees are entitled to official immunity

---

**25.** In *Justice*, the Court analyzed the Fourth Amendment claim of a fourteen-year-old girl required to "remove her outer garments, expose her breasts, and stand before them clad only in her panties" during a routine search in jail for contraband after her arrest for minor offenses. In determining the reasonableness of the search, the Eleventh Circuit in *Justice* considered "the scope of the search and how much it intruded upon privacy," including an examination of "the manner in which the officers conducted the strip search, the place in which it was conducted, and the justification for initiating it." 961 F.2d at 192–193. The Court concluded that "without

doubt," the search was conducted in "the least intrusive manner" and was therefore constitutional under the circumstances where:

> the officer[s] took [the girl] to an empty room and two uniformed female officers watched her disrobe to her panties [and] limited the search in the following manner: (1) having members of the same sex perform the search, (2) using a room where only the participants were present to conduct the search, and (3) limited the search to exclude body cavities.

*Id.* at 193.

from their actions if those actions are within the scope of their employment, discretionary in nature, and without wilfulness, malice, or corruption." *Foster v. Raspberry,* 652 F.Supp.2d at 1354 (quoting *Wright v. Ashe,* 220 Ga.App. 91, 469 S.E.2d 268, 270 (1996)).[26] A discretionary task is one which "calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." *Stone v. Taylor,* 233 Ga.App. 886, 506 S.E.2d 161, 163 (1998) (internal quotation marks omitted). "Georgia courts have repeatedly held that the supervision and discipline of students are discretionary acts." *Foster,* 652 F.Supp.2d at 1355 (citing cases and finding that school official's strip search of students fell within category of discretionary acts entitling defendant to official immunity under Georgia law); *Gamble v. Ware County Bd. of Educ.,* 253 Ga.App. 819, 561 S.E.2d 837, 843 (2002) (finding that the tasks of "supervising and disciplining school children constitute discretionary acts"); *Payne v. Twiggs County Sch. Dist.,* 232 Ga.App. 175, 501 S.E.2d 550, 552 (1998) (finding that the investigation of a student's complaint against another student was discretionary); *Wright,* 469 S.E.2d at 271 (noting that the task imposed on teachers to monitor, supervise, and control students is a discretionary one).

■■■ Therefore, unless Plaintiff can establish that McDowell acted with actual malice in executing the strip search, McDowell is entitled to official immunity. *Merrow v. Hawkins,* 266 Ga. 390, 467 S.E.2d 336, 338 (1996); *see also* O.C.G.A. § 20–2–1000(b) (providing "[n]o educator shall be liable for any civil damages for, or arising out of, any act or omission concerning, relating to, or resulting from the discipline of any student or the reporting of any student for misconduct, except for acts or omissions of willful or wanton misconduct."). In the context of official immunity, "actual malice requires a deliberate intention to do wrong and denotes express malice or malice in fact." *Adams v. Hazelwood,* 271 Ga. 414, 520 S.E.2d 896, 898 (1999) (internal citations and quotation marks omitted) (quoting *Merrow v. Hawkins,* 266 Ga. 390, 467 S.E.2d 336, 338 (1996)). The Georgia Supreme Court has held that the terms "actual malice" or "malice in fact" are distinguished from "implied malice," a term which has been defined to mean conduct exhibiting a "reckless disregard" for the rights or safety of others. *Merrow v. Hawkins,* 467 S.E.2d at 338 (abrogating cases decided prior to 1991 amendment to Art. I, Sec. II, Par. IX of the Georgia Constitution defining "malice" as opposed to "actual malice" as involving reckless disregard for the rights of others).

Plaintiff asserts that where the evidence is construed in his favor, the Court can infer that McDowell acted with actual malice because it is undisputed that he insisted on conducting the strip search of D.H. in view of his three peers despite D.H.'s plea for privacy, had no good reason to demand the search transpire before D.H.'s classmates, and demanded a search of D.H.'s underwear and genitals despite the fact that the marijuana had not been found hidden against another student's genitals, but was merely found in the waistband of his underpants. In light of the high bar

---

**26.** Where a task is ministerial, official immunity does not apply. *Foster,* 652 F.Supp.2d at 1354. "Generally, a ministerial act is one that 'is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty.' " *Meagher v. Quick,* 264 Ga.App. 639, 594 S.E.2d 182, 185 (2003) (quoting *Stone v. Taylor,* 233 Ga.App. 886, 506 S.E.2d 161, 163 (1998)).

for demonstrating actual malice set by the Georgia Supreme Court, bolstered by the general construction of O.C.G.A. O.C.G.A § 20–2–1000 as providing great deference to educators for acts relating to discipline of students, the Court finds that the facts of this case may demonstrate that McDowell acted with gross indifference or reckless disregard of D.H.'s rights but do not amount to "actual malice" as interpreted by the Georgia Supreme Court. The Court therefore finds that McDowell is entitled to official immunity as a matter of law as to Plaintiff's state law claims. Accordingly, the Court **GRANTS** McDowell's Motion for Summary Judgment [Doc. 112] with respect to Plaintiff's state law claims.

### C. Liability of CCSD for Failure to Train

Plaintiff seeks summary judgment on its claim against CCSD for failure to train its employees on the constitutional limitations imposed on student searches in the wake of the Eleventh Circuit's decision in *Thomas* and the Supreme Court's decision in *Safford.* Plaintiff contends the undisputed evidence shows that from 1996 to 2011, CCSD· did nothing to ensure that its employees searched students in a lawful manner. Plaintiff further contends that CCSD failed to materially change its policy after being put on notice in 2001 and 2003 that such a policy resulted in unconstitutional searches of its students in *Thomas.* According to Plaintiff, there is no evidence that CCSD trained any of its employees and officials from at least 2008 to 2011 regarding how, whether, and under what circumstances to conduct strip searches of its students. Plaintiff contends that CCSD failed to keep records of the searches conducted on its students, yet there is evidence that school officials were often faced with the need to search students at EWA for contraband such as drugs and weapons. In response to Plain-

tiff's motion and in support of its own summary judgment motion, CCSD asserts that the facts of *Thomas* were an isolated event, occurring over sixteen years prior to the 2011 searches at issue in this case, and cannot put the school district on notice of the need for training without a widespread pattern of prior constitutional violations.

A municipality can be held liable under § 1983 "when its employees cause a constitutional injury as a result of the municipality's policy [ ] or custom-based failure to adequately train or supervise its employees." *Am. Fed'n of Labor & Cong. of Indus. Organizations v. City of Miami* (hereinafter "*AFL–CIO v. City of Miami*"), 637 F.3d 1178, 1188–89 (11th Cir.2011) (citing *Gold v. City of Miami,* 151 F.3d 1346, 1350 (11th Cir.1998)). In order to give rise to liability under 42 U.S.C. § 1983, a governmental entity's "failure to train its employees in a relevant respect must amount to deliberate indifference to the [constitutional] rights of persons with whom the untrained employees come into contact." *Connick v. Thompson,* —— U.S. ——, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011) (quotation marks and brackets omitted). However, the government's "culpability for a deprivation of rights is at its most tenuous where a claim turns on failure to train." *Id.* Under the Eleventh Circuit's framework, a plaintiff must prove three elements in order to prevail on a § 1983 action for failure to train: "(1) the government inadequately trained or supervised its employees; (2) the failure to train is an official policy; and (3) the policy caused the employees to violate the plaintiff's rights." *Thomas,* 261 F.3d at 1173.

A governmental entity is "not automatically liable under section 1983 even if it inadequately trained its [employ-

ees] and those [employees] violated [the plaintiffs] constitutional rights." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir.1998). Rather, "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by city policymakers. Only where a failure to train reflects a deliberate or conscious choice by a municipality—a policy as defined by our prior cases—can a [municipality] be liable for such a failure under § 1983." *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 388–89, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)) (internal quotations and citations omitted). Plaintiff may demonstrate "that a policy existed by showing that the government knew that a need to train or supervise its employees existed but made a deliberate choice not to take any action." *Thomas* 261 F.3d at 1173 (citation omitted); *Gold*, 151 F.3d at 1350.

▬ To prevail on a failure to train claim is a tall order. Plaintiff must prove that the failure "was a conscious choice by policymakers among alternative courses of action, which in turn, caused the [employees'] deliberate indifference." *Young v. City of Augusta, Georgia*, 59 F.3d 1160, 1172 (11th Cir.1995). As the Supreme Court in *City of Canton* explained,

- The issue in a case like this one . . . is whether [the] training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent '[municipal] policy.' It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train [ ] its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the

violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the [municipality] is responsible, and for which the [municipality] may be held liable if it actually causes injury.

489 U.S. at 390, 109 S.Ct. 1197. "Before it may be said that a municipality has made a deliberate choice among alternative courses of action, its policymakers must have had 'actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens.'" *Young*, 59 F.3d at 1172 (citing *City of Canton*, 489 U.S. at 396, 109 S.Ct. 1197 (O'Connor, J., concurring in part and dissenting in part) (*cited with approval in Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994))).

▬ Plaintiff may demonstrate that CCSD was on notice of the need to train its employees by presenting sufficient evidence that: "(1) [CCSD's] employees face clear constitutional duties in recurrent situations; or (2) a pattern of constitutional violations exists such that [CCSD] knows or should know that corrective measures are needed." *Thomas*, 261 F.3d at 1173 (internal quotations omitted). "A plaintiff may demonstrate notice by showing a 'widespread pattern of prior abuse' or even a single earlier constitutional violation." *AFL–CIO v. City of Miami*, 637 F.3d at 1189 (citing *Gold*, 151 F.3d at 1351). The Eleventh Circuit has cautioned that establishing notice of a need to train is difficult because: (1) "a plaintiff must also demonstrate that constitutional violations were likely to recur without training," and (2) that the municipality "made a deliberate choice" not to train its employees. *AFL–CIO v. City of Miami*, 637 F.3d at 1189

(citing *Gold,* 151 F.3d at 1350, 1352 n. 12). Thus, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct.. 2427, 85 L.Ed.2d 791 (1985).

> This high standard of proof is intentionally onerous for plaintiffs; imposing liability on a municipality without proof that a specific policy caused a particular violation would equate to subjecting the municipality to respondeat superior liability—a result never intended by section 1983. As the Supreme Court has ·explained, [t]o adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident. Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in de facto respondeat superior liability on municipalities.... [*City of Canton,* 489 U.S.] at 391–92, 109 S.Ct. 1197; *see also [Bd. of Cnty. Comm'rs of Bryan Cnty. v.] Brown,* [520 U.S. 397, 415, 117 S.Ct. 1382] ("Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability.").

*Gold,* 151 F.3d at 1351, n. 10.

■ Even so, the Eleventh Circuit has also recognized that "[i]n some cases, the need for training is so obvious that deliberate indifference can be established even

without an earlier violation or pattern of abuse. Still, it must have been obvious that the municipality's failure to train or supervise its employees would result in a constitutional violation." *Id.* (citing *Bd. of Cnty. Comm'rs v. Brown,* 520 U.S. 397, 409, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)).

■ Plaintiff's failure to train argument relies heavily on this Court's prior order denying CCSD's motion to dismiss that claim. Plaintiff construed the Court's order as setting a blueprint for establishing the evidence necessary to demonstrate that CCSD's failure to train may be considered an official policy on account of CCSD officials facing clear constitutional duties in recurrent situations as follows:

> 1) CCSD's search policy anticipates the need to search students for possessing contraband,
> 2) CCSD's search policy reveals the need for officials to determine the propriety of initiating a search and determining the scope of that search,
> 3) CCSD did not amend this policy in material respect since it conducted the *Thomas* strip searches, and
> 4) the policy "specifies no criteria whatsoever to guide its employees in avoiding intrusive bodily searches that cross the line of constitutionality."

*D.H. ex rel. Dawson,* 904 F.Supp.2d at 1306. Plaintiff asserts that the record has established each of these facts, thus entitling him to summary judgment against CCSD as a result of its failure to train school officials on the constitutional limits of strip searches that led to the·unconstitutional strip search of D.H. in this case.

CCSD's search "policy" in effect at the time of the searches conducted in 1996 that precipitated the *Thomas* lawsuit provided that "[s]chool administrators, or their designated representatives, possess

the authority to conduct reasonable searches of students on school property. The administrator is required to have only reasonable suspicion to conduct such searches." (Pl.'s SMF ¶ 12; CCSD's Resp. SMF ¶ 12.) *See Thomas v. Clayton County Board of Education,* 94 F.Supp.2d 1290, 1313–1314 (N.D.Ga.1999) (describing specific elements of CCSD's previous search policy). The official CCSD search policy at issue in February 2011, at the time of the strip search of D.H. provides:

> As permitted by applicable authority, the principal or designee of each school in the District may conduct reasonable inspection of students' school lockers, articles carried upon their persons, and vehicles in order to properly investigate and address student misconduct. Searches based on reasonable suspicion may proceed without hindrance or delay, and they should be conducted as directed by school administration. Searches will be based on a reasonable suspicion of the presence of harmful or prohibited items.[27]

(Hendrix Dep. Ex. 10; Hendrix Dep. at 77.) As noted previously by the Court, the two policies "appear[ ] virtually the same in [their] material elements" and neither policy "provides specific guidelines beyond the need for 'reasonable suspicion'... to guide its employees in avoiding intrusive bodily searches that cross the line of constitutionality." *D.H. ex rel. Dawson,* 904 F.Supp.2d at 1306. In denying CCSD's prior motion to dismiss, this Court found that "[g]iven the sequence of events alleged in the District, the CCSD policy's anticipation of the need to conduct student searches and the constitutional issues surrounding such searches, the Complaint alleges sufficient facts to support a *plausible* claim that CCSD's employees faced duties to conduct searches in conformity with the Fourth Amendment on a recurrent basis." *Id.* (emphasis added).

Plaintiff has presented evidence that although CCSD may have conducted some training from 2004 to 2007, there is no evidence that CCSD conducted any training from at least 2008 until after the

27. In its own motion for summary judgment, CCSD relied on an entirely different "policy," arguing that because this policy does not expressly permit searches of students,. as opposed to their belongings, there was no need to provide training on strip searches. The specific provision relied upon comes from an undated Student Handbook stating:

> Clayton County Public Schools may use metal detectors, sniffing dogs or other detection devices, such as wands, etc., to ensure school safety. Routine unannounced searches of cars on school property, school buses, lockers, school computers, and student desks will be conducted by school officials. Students and parents are hereby notified that a student has no expectation of privacy in these locations, including in student vehicles if the student chooses to exercise the privilege of parking on campus. Unauthorized items and items that threaten the safety of self and others will be seized and the appropriate disciplinary action will be taken.

As discussed earlier in this Order, Plaintiff objected in his Motion to Strike to Defendant's reliance on this newly offered "policy," provided for the first time in connection with its summary judgment motion. The Court granted Plaintiff's motion to strike CCSD's belated offering of the handbook language, particularly as its official "policy" is inconsistent with its binding admissions and the testimony of the District's Rule 30(b)(6) representative. Upon Plaintiff's raising its objections to the District's reliance on the newly identified handbook policy, CCSD reverted in its reply brief to its reliance on the search policy contained in the official administrative regulation set forth in JD–R(1). CCSD argues that the policy in JD–R(1) does not permit the searching of students but allows only searches of students' belongings such as "school lockers, articles carried upon their persons, and vehicles."

search at issue here in 2011. CCSD had no written training materials from 2000 to 2011 addressing when or how to conduct strip searches.[28] McDowell testified that he did not receive any training from CCSD regarding his authority to search students or the limits on conducting strip searches and was never trained or informed by anyone at CCSD as to what "applicable authority" governed the scope of the school district's search policy. Yet, McDowell understood that he, as a school administrator, had the authority to search students' clothing, pockets, book bags, and "anything that's on the physical person of the student," including their underwear.

Plaintiff also demonstrated that CCSD failed to produce any documentation of either the number or scope of student searches carried out by its administrators, specifically that: (1) CCSD does not maintain a centralized data collection device to record or analyze data or information regarding student searches; (2) CCSD has no mechanism in place to determine how many searches, searches of clothing, or strip searches its employees conduct; and (3) CCSD does not maintain any standardized documentation system with the purpose of memorializing the date, time, location, and factual basis for the execution of student searches. More troubling is CCSD's admission that it retained no documents related to the *Thomas* case which held unconstitutional the school district's

prior strip searches of multiple students, (Pl.'s SMF ¶ 24; CCSD's Resp. SMF ¶ 24), especially in light of the *Thomas* Court's recognition that "retaining some record of the searches would be a valuable tool in preventing future constitutional violations in the District's schools." [29] *Thomas*, 261 F.3d at 1177. As a result, CCSD has no knowledge regarding the total number of student searches conducted by its teachers or administrators any years from 1996 to the present.

The only circumstances under which a student search might be documented would be if a complaint was made by a student or parent against a school official following a search or a criminal investigation was undertaken by a SRO in the event illegal contraband was found during a search. CCSD produced two documented complaints regarding student searches, the first from November 2010 (before the search at issue here) and the second from October 2012 (after the search at issue here). It appears that CCSD failed to maintain records of searches, either in the form of physical documents or as electronically stored information ("ESI"), that may have occurred prior to February 2008. (*See* Doc. 162.) CCSD's 30(b)(6) Representative, Douglas Hendrix, testified that CCSD experienced a great deal of turnover in its administration and that it is likely that the only people with knowledge

---

28. The only written document produced by CCSD regarding training prior to the search, dated August 2010, discusses the reasonable suspicion standard from the Supreme Court's 1985 decision in *T.L.O.*, but does not discuss either the Eleventh Circuit's 2001 and 2003 decisions in *Thomas* or the Supreme Court's 2009 decision in *Safford*.

29. Although Plaintiff does not argue that he was prevented from establishing a pattern of prior unconstitutional searches because CCSD failed to document all searches conducted and purged its records related to the

aftermath of the unconstitutional searches in *Thomas*, Plaintiff does point to CCSD's failure to keep records as evidence of its attitude of indifference. The Eleventh Circuit in *Gold*, however, noted that despite the fact that the City did document all citizen complaints of false arrest and retained its records as far back as 1985 or 1986, municipalities are not necessarily obligated to keep such records for the purpose of enabling plaintiffs to prove their claims. *Gold*, 151 F.3d at 1353–54, n. 14.

of the searches in the *Thomas* case are no longer employed with the school district. (Hendrix Dep. at 58.) In fact, Hendrix testified that he, himself, was not aware of the 1996 strip searches in *Thomas*. (*Id.*)

In light of this evidence, Plaintiff contends he is entitled to summary judgment on his claim against CCSD. Plaintiff asserts that CCSD's failure to modify its search policies to explain the applicable authority governing strip searches, its failure to conduct training, and its failure to document prior unconstitutional student searches since 1996, created a generation of administrators who went untrained in an atmosphere of indifference. In response, CCSD baldly asserts that the school district did in fact change its policy to prohibit searches of students, although CCSD has presented no evidence of formal action of the school board with the purpose of prohibiting strip searches. CCSD argues that the search policy in effect in 2011, as set forth in JD–R(1), did not permit the searching of students but allowed only searches of students' belongings such as "school lockers, articles carried upon their persons, and vehicles." As the policy did not permit searches of students, CCSD further argues that teachers were not faced with the constitutional duty of deciding when and how to properly conduct student searches.

Contrary to CCSD's argument, the Court finds that CCSD's search policy in JD–R(1) does not expressly prohibit searches of students and is reasonably susceptible to an interpretation that school officials are permitted to search "articles carried upon [the students'] persons" including their clothing. Indeed, CCSD argues that McDowell's search of D.H.'s pockets and socks was permissible. Record evidence shows that school officials often searched students' articles of clothing including pants pockets and socks, and in some instances pockets of shorts worn under their pants. As the Court acknowledged previously in its Order on CCSD's motion to dismiss, it is plausible, in light of the language of the policy, that administrators would be faced with recurring situations where students would be subject to searches for contraband or other evidence of misconduct sufficient to put CCSD on notice of a need to train its employees on the contours of the law regarding strip searches.

On summary judgment, however, Plaintiff has failed to present sufficient evidence that CCSD officials were "recurrently faced with situations which are so similar to the facts of the instant case that the need for training would be obvious." *Thomas*, 261 F.3d at 1174. Plaintiff has offered evidence that searches of students for contraband are recurring events faced by CCSD school officials. However, plaintiff has not pointed to evidence that searches similar to that conducted on D.H. were in fact carried out on a regular basis.[30] What Plaintiff's motion fails to address head-on is that "[p]roving that

**30.** The Court notes that the record is not undisputed, as Plaintiff contends, that McDowell witnessed searches conducted by other principals where students were required to pull down their pants so that the pockets of basketball shorts worn under their pants could be searched. Even assuming that was the case, there is no indication that those students were in turn asked to pull down their basketball shorts and expose their underwear and genitals to a search. Accordingly, the Court does not view those searches referenced by McDowell as being similar to the search of D.H. in order to put CCSD on notice of a need to train. *See Thomas*, 261 F.3d at 1171 (noting that evidence presented by the students lacks the detail necessary for a court to determine whether any of the searches were, if not unconstitutional, at least suspect). Additionally, no evidence was presented that the school board had notice of the searches at McDowell's former school.

searches occurred" is not enough, plaintiffs "must also show that the searches conducted by school personnel were constitutionally suspect" in order to demonstrate the necessary pattern of unconstitutional behavior that should have led CCSD to train its employees or put CCSD on notice of the need for such training. *Thomas,* 261 F.3d at 1174; *Gold,* 151 F.3d at 1351.

Aside from the 1996 searches later declared unconstitutional in *Thomas,* Plaintiff has identified only one alleged prior strip search of which CCSD had notice. In November 2010, an unidentified student confided in his teachers, Ms. Harmon and Ms. Couch, that another school official, Dr. Booker, had conducted a strip search wherein Dr. Booker asked the student to "pull his shirt up and pull his pants down." (Doc. 162–1.) The incident was reported to another CCSD official, Ms. Rice, who indicated that in order to conduct a proper investigation, the student would need to be identified and questioned. (*Id.*) It appears that the student was identified, and an investigation was conducted by SRO James who concluded that "there was absolutely no truth to the allegation." (*Id.*) No other evidence regarding the validity of the complaint was produced. Plaintiff must come forward with some evidence of valid complaints of incidents "in which constitutional rights were similarly violated." *See Gold,* 151 F.3d at 1351 (reiterating that "the number of complaints bears no relation to their validity"). Therefore, this single, uncorroborated accusation is not sufficient to demonstrate a pattern of meritorious complaints of unlawful strip searches as necessary to prove Plaintiffs claim against CCSD. *Id.* (citing *Brooks v. Scheib,* 813 F.2d 1191, 1193 (11th Cir.1987) (holding that even though there had been ten citizen complaints about the defendant police officer, the City did not have any notice of past police misconduct because the plaintiff "never demonstrated that past

complaints of police misconduct had any merit")).

■ Plaintiff is correct that "when the [municipality's] policymakers are on actual or constructive notice that a particular omission in their training program causes [their] employees to violate citizens' constitutional rights, the [municipality] *may* be deemed deliberately indifferent *if* the *policymakers choose* to retain that program." *Connick,* 131 S.Ct. at 1360 (citing *Brown,* 520 U.S. at 407, 117 S.Ct. 1382) (emphasis added). Under those circumstances, a municipality's " 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the [municipality] itself to violate the Constitution.' " *Id.* (citing *Canton,* 489 U.S. at 395, 109 S.Ct. 1197 (O'Connor, J., concurring in part and dissenting in part)). While "[p]olicymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish" the requisite " 'deliberate indifference' necessary to trigger municipal liability, ... *without notice* that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* Thus, without evidence of such notice, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* (citing *Cnty. Comm'rs v. Brown,* 520 U.S. at 409, 117 S.Ct. 1382) (emphasis added).

■ The Eleventh Circuit has "noted that a single constitutional violation may result in municipal liability when there is 'sufficient independent proof that the moving force of the violation was a municipal policy or custom.' " *Vineyard v. Cnty. of*

*Murray,* 990 F.2d 1207 (11th Cir.1993) (citing *Gilmere v. City of Atlanta,* 774 F.2d 1495, 1504 n. 10 (11th Cir.1985), *cert. denied,* 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986), and 476 U.S. 1124, 106 S.Ct. 1993, 90 L.Ed.2d 673 (1986)); *AFL–CIO v. City of Miami,* 637 F.3d at 1189. While the Eleventh Circuit's decision in *Thomas* put CCSD on notice of the unconstitutional conduct at issue there, the Court cannot say that *Thomas* put the district policy makers on notice of the inadequacy in their training program. Indeed, the *Thomas* Court upheld the district court's grant of summary judgment in favor of the school district on the students' failure to train claim, holding that "[i]f there were deficiencies in the District and County's policies and training, they were not the driving force behind the constitutional violations. Accordingly, the court did not err in declining to compel the District and County to alter their policies." *Thomas,* 261 F.3d at 1173–76. This Court cannot therefore find, as Plaintiff contends, that *Thomas* put CCSD on notice of a need to train its employees regarding the constitutional parameters for conducting student strip searches. *See Keith v. DeKalb Cnty.,* 749 F.3d 1034, 1050–1053 (11th Cir.2014) (rejecting the plaintiffs argument that prior lawsuit against county following death of inmate provided requisite notice to sheriff in subsequent wrongful death suit that training provided to detention officers was constitutionally deficient).

Recently, in *Keith v. DeKalb Cnty.,* the Eleventh Circuit considered a failure to train claim in a case where a pretrial detainee was murdered in 2009 by another inmate with whom he had been housed during his incarceration at the Dekalb County jail. *Keith,* 749 F.3d at 1051. The plaintiff in *Keith* argued that the sheriff was on notice, following another inmate-on-inmate murder in the jail five years earlier in 2004, that practices within the jail related to the placement of mental health inmates in certain cells based on the use of an armband system posed a substantial risk of serious harm to inmates. *Id.* (citing *Jenkins v. DeKalb Cnty.,* 528 F.Supp.2d 1329 (N.D.Ga.2007), *aff'd* 307 Fed.Appx. 390 (11th Cir.2009)).[31] In *Keith,* the plaintiff argued that by admitting that there were problems with the jail's armband system as part of the prior litigation in *Jenkins,* the sheriff was aware of and acquiesced to the substantial risk of serious harm to inmates created by the jail's housing and segregation policy and by allowing officers the discretion to relocate inmates. *Id.* Reversing the district court's finding that the sheriff had knowledge of the risk at issue through the *Jenkins* lawsuit involving similar claims and facts, the Eleventh Circuit held that,

> *Jenkins* demonstrates [ ] an isolated incident [that] while tragic, is not evidence of widespread and flagrant abuse sufficient to alert [the sheriff] to a substantial risk of serious harm.... The *Jenkins* incident did not provide the requisite notice to Sheriff Brown that the training provided to detention officers was constitutionally deficient.

*Id.* at 1051–1053.

The *Keith* Court further found that that the "failure to train" at issue in the case was not so obvious as to amount to deliberate indifference as contemplated by the Supreme Court's single incident hypothesis in *City of Canton. Id.* at 1053, n. 56

---

**31.** In *Jenkins* the appeals court affirmed the district court's grant of summary judgment to defendants and despite the allegations of Jenkins's children that the Sheriff failed to supervise and train the officers, the officers were deliberately indifferent to a significant risk of serious harm to Jenkins when they placed another inmate in his cell, and that the officer's indifference caused Jenkins's death. 528 F.Supp.2d 1329, *aff'd* 307 Fed.Appx. 390.

(viewing the "single incident" basis of custom and practice liability very skeptically). Nor has Plaintiff here demonstrated that CCSD acted with deliberate indifference by showing the "obviousness" of a need for additional training of school officials to prevent future unconstitutional strip searches. *See Canton,* at 390, n. 10, 109 S.Ct. 1197 (recognizing the possibility "in a narrow range of circumstances" that the unconstitutional consequences of failing to train could be so patently obvious that a municipality could be liable under § 1983 without proof of a pre-existing pattern of violations); *Connick,* 131 S.Ct. at 1361–65 (concluding that the failure to train prosecutors in their *Brady* obligations does not fall within the narrow range of *Canton's* hypothesized single-incident liability). Without compelling evidence that the case falls within the narrow range of "single-incident" liability hypothesized in *Canton,* the Court must grant judgment as a matter of law to Defendant on Plaintiff's failure to train claim because Plaintiff "did not prove a pattern of similar violations that would 'establish that the 'policy of inaction' [was] the functional equivalent of a decision by the [District] itself to violate the Constitution.'" *Id.* (quoting *Canton,* 489 U.S. at 395, 109 S.Ct. 1197); *cf. Herrera v. Santa Fe Public Schools,* 41 F.Supp.3d 1188, 1271–72, 2014 WL 4298062, *56–57 (D.N.M.2014).[32]

■ Plaintiff has alternatively offered no evidence to support a finding that the Board made a conscious policy choice or implicitly made one because there was strong evidence before them of the need

for training of principals on searches and because of the potential for their violation of students' constitutional rights in the absence of such training. Beyond the *Thomas* incidents that are more than a decade old, Plaintiff presented no specific evidence that the Board was provided with information regarding problematic search issues in the school district and declined or failed to take action. Under the "stringent standard of fault" of deliberate indifference "requiring proof that a municipal[ity] disregarded a known or obvious consequence of [its] action," Plaintiff must demonstrate conduct that is so obvious it is essentially in the board's face that a particular omission in the training program is causing school officials to violate students' constitutional rights. *See Connick,* 131 S.Ct. at 1360. Even when viewed in the light most favorable to Plaintiff, the Court cannot conclude that the record evidence satisfies this standard. In previously denying CCSD's motion to dismiss this claim, the Court found that a pattern of violations was *plausibly established* by whether the past violations in *Thomas* and CCSD's retention of essentially the same student search policy used in *Thomas* should have apprised CCSD of a need to train—as opposed to the volume of violations. Nonetheless, the Court acknowledged that the gap in time between the *Thomas* decision (and events therein) and the 2011 incident at issue here may prove important at summary judgment. This time gap remains problematic at the summary judgment stage in the absence of more connective evidence or alternatively, evidence of

---

**32.** The court in *Herrera* found that the evidence was sufficient to allow a reasonable jury to deem the practice of suspicionless pat-down searches to arise from the school board's deliberately indifferent training or supervision although the board had not promulgated a formal policy of suspicionless searches and indeed formally prohibited such

a policy. *Herrera,* 41 F.Supp.3d at 1271–72, 2014 WL 4298062, *56–57. The evidence indicated that for sixteen consecutive proms, students were searched with a pat-down prior to entry and that board members regularly attended those proms as chaperones and observed prom check-in procedures. *Id.*

relevant discussions in front of the School Board. Had the events in *Thomas* occurred a few years prior to the search at issue here, such evidence might have been sufficient to establish that the CCSD School Board was on notice that its failure to properly train school officials on the constitutionality of strip searches without evidence of a widespread pattern of similar conduct or violations.

While the Plaintiff has provided evidence that other districts recognized the need for more specific policies addressing strip searches in the wake of the *Thomas* decisions issued in 2001 and 2003 and *Safford* in 2009, that evidence by itself—without more—is not sufficient to establish that the Clayton County School Board considered the student search policy and made a deliberate choice not to take action (i.e., to adopt a policy or training that addressed the issue of strip searches or principals' exercise of discretion in conducting student searches). *See AFL–CIO v. City of Miami*, 637 F.3d at 1189 (finding that while city was on notice that its use-of-force policies and training needed improvement following report detailing the preliminary findings of a DOJ investigation regarding police department's use of force, summary judgment was nonetheless appropriate where the plaintiff failed to adduce evidence that the city was on notice of a need to train and also that the city made a choice not to do so). *If* there was evidence of more strip searches in the interim period or *if* there was evidence of these policy issues coming before the Board in one fashion or another (parental complaints; legal advice; Board members' report back from attendance at Georgia School Board Association meetings and express refusal to adopt newer policies adopted by other boards, etc.), such evidence would perhaps be sufficient to allow a municipal failure to train claim to survive summary judgment here. In light of the

testimony by CCSD's representative regarding the complete upheaval present in the administration of the school district, without evidence of official board action following the events in *Thomas* or other evidence demonstrating inaction by the school board in the face of similar complaints or information being made or presented to the Board, the Court cannot find that CCSD had actual or constructive notice of a need for corrective training.

In conclusion, the Court finds that the Eleventh Circuit's holdings in *AFL–CIO v. City of Miami* and *Keith v. DeKalb County*, in combination with the Plaintiff's inability or failure to develop more evidence on custom and practice based on deliberate action on the part' of CCSD, spells the doom of Plaintiffs government failure to train claim. Accordingly, the Court **GRANTS** Defendant CCSD's Motion for Summary Judgment [Doc. 117] and **DENIES** Plaintiffs Motion for Summary Judgment as to Defendant CCSD [Doc. 114].

### III. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** Plaintiffs Motion to Strike the Declaration of Latasha Lowe [Doc. 137], **GRANTS IN PART** and **DENIES IN PART** Defendant McDowell's Motion for Summary Judgment [Doc. 112], **GRANTS** Plaintiffs Motion for Partial Summary Judgment as to Defendant McDowell [Doc. 116], **DENIES** Plaintiffs Motion for Summary Judgment as to Defendant CCSD [Doc. 114], and **GRANTS** Defendant CCSD's Motion for Summary Judgment [Doc. 117].

The Court will require the parties to participate in mediation prior to conducting a jury trial solely on the issue of Plaintiff's damages under § 1983 for his federal claim which will naturally require

the parties to present a mini-trial on the evidence establishing McDowell's liability for the unconstitutional strip search. The Clerk is **DIRECTED** to refer this case to the next available magistrate for mediation to be completed within **FORTY FIVE (45) DAYS.** In the event the case is not resolved, the parties **SHALL** submit their proposed consolidated pretrial order within **TWENTY (20) DAYS** of the conclusion of the mediation.